Javier **SANCHEZ–ESPINOZA**, et al., Appellants,

v.

Ronald Wilson **REAGAN**, President of the United States, et al.

No. 83–1997.

United States Court of Appeals, District of Columbia Circuit.

Argued May 24, 1984.

Decided Aug. 13, 1985.

Peter Weiss, New York City, of the Bar of the Supreme Court of New York, pro hac vice by special leave of the Court and Michael D. Ratner, Washington, D.C., with whom William Schaap, Washington, D.C., was on brief, for appellants.

John M. Rogers, Atty. Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Michael F. Hertz, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellees Reagan, et al.

Peter W. Homer, Miami, Fla., with whom Gregory W. Homer, Washington, D.C., was on brief, for appellee Vargas.

David Carliner and Steven M. Schneebaum, Washington, D.C., was on brief for amicus curiae The Intern. Human Rights Law Group, urging reversal.

Daniel J. Popeo and Paul D. Kamenar, Washington, D.C., were on brief for amici curiae Senator Steven Symms, et al., urging affirmance.

Before TAMM, GINSBURG and SCALIA, Circuit Judges.

SCALIA, Circuit Judge:

The complaint at issue in this appeal recites various causes of action arising out of appellees' alleged support of forces bearing arms against the government of Nicaragua (so-called "Contra" forces). The United States District Court for the District of Columbia granted a motion to dismiss, primarily on the ground that the case presented a nonjusticiable political question. The issues presented by the appeal include whether the Alien Tort Statute, 28 U.S.C. § 1350 (1982), confers jurisdiction over suits against officers of the United States alleging violation of international law by this country; whether the nonresident alien appellants can maintain an action for damages to vindicate their asserted rights under the fourth and fifth amendments to the United States Constitution or under any of several statutes relating to United States foreign and military affairs; whether those appellants who are members of Congress can obtain judicial relief for the Executive Branch's alleged violation of the constitutional provision reserving to Congress the power to declare war; and whether, in the circumstances of this case,

discretionary judicial remedies can properly be invoked.

## I

The appellants can be divided into three groups: First, twelve citizens of Nicaragua, nine of whom reside there, two of whom reside in Germany, and one in France (the "Nicaraguan appellants"), who sue for redress of tortious injuries to themselves or their families at the hands of the Contras in Nicaragua. Second, twelve members of the United States House of Representatives (the "congressional appellants"), who sue to end appellees' alleged disregard of Congress's right to declare war and of a prohibition against supporting the Contras imposed by Congress through statute. Third, two residents of Dade County, Florida, who sue to enjoin an alleged nuisance created by the maintenance and operation of paramilitary camps at that location.

The appellees can also be divided into three groups: First, nine present or former United States executive officials (the "federal appellees"), most of whom are sued both individually and in their official capacities.[1] Second, two organizations—Alpha 66, Inc., and Bay of Pigs Veterans Association, Brigade 2506, Inc.—which are alleged to operate paramilitary training camps in the United States. Third, Max Vargas, a Nicaraguan exile and resident of the State of Florida, who is alleged to be leader of the Nicaraguan Democratic Union-Revolutionary Armed Forces of Nicaragua, which operates paramilitary camps in Nicaragua and elsewhere.[2]

For purposes of this appeal from a pretrial dismissal, we must accept as true the factual assertions made in the complaint, though of course many of them might be contested at trial. The principal assertions, in addition to those alluded to above, are as follows: That the federal appellees, "acting in concert and conspiracy with the other defendants and others unknown, have authorized, financed, trained, directed and knowingly provided substantial assistance for the performance of activities which terrorize and otherwise injure the civilian population of the Republic of Nicaragua." Amended Complaint ¶ 31. That in November 1981 President Reagan, various members of the National Security Council, and others approved a plan submitted by the CIA for covert activities to destabilize and overthrow the government of Nicaragua. That pursuant to that plan, the United States has provided financial assistance of at least $19 million, training by mobile teams of United States military personnel, and other forms of support to paramilitary groups in their operations against Nicaragua. That the federal appellees "are providing financial, technical, and other support to anti-Nicaraguan terrorist groups operating military training camps in the United States, Honduras, Costa Rica, and Nicaragua." *Id.* ¶ 54. And that as a result of this assistance the Contras have carried out "scores of attacks upon innocent Nicaraguan civilians" which have "resulted in summary execution, murder, abduction, torture, rape, wounding, and the destruction of private property and public facilities." *Id.* ¶ 81. The complaint recounts the specific instances of attacks on Nicaraguan towns and villages that caused harm

---

**1.** The nine named federal appellees, and their offices at the time the amended complaint was filed, are President Reagan, CIA Director William Casey, former Secretary of State Alexander Haig, Secretary of State George Schultz, Assistant Secretary of State for Inter-American Affairs Thomas Enders, United States Ambassador at Large Vernon Walters, Secretary of Defense Caspar Weinberger, Deputy Assistant Secretary of Defense for Inter-American Affairs Nestor Sanchez, and United States Ambassador to Honduras John Negroponte. Enders is sued individ-

ually only. The complaint does not specify in what capacity Haig is sued.

**2.** The complaint also lists two "as yet unidentified officers and/or agents employed by the United States who are carrying out activities which have led to the injuries suffered by plaintiffs." Amended Complaint ¶ 30(a). These defendants are not mentioned in appellants' statement of the case or elsewhere in appellants' briefs, and we shall disregard them as well in our analysis—which is in any case unaffected by their existence.

to the Nicaraguan appellants, and alleges that the "raids are continuing on a regular basis." *Id.* ¶ 117.

The complaint lists six federal causes of action, and one pendent state claim under the law of Florida.[3] The relief sought is compensatory and punitive damages, declaratory relief, mandamus, injunction, attorneys' fees, and any other just and proper relief.

The District Court dismissed all the federal claims on the ground that their resolution would require the court to address a nonjusticiable political question, citing our decision in *Eminente v. Johnson,* 361 F.2d 73 (D.C.Cir.), *cert. denied,* 385 U.S. 929, 87 S.Ct. 287, 17 L.Ed.2d 211 (1966). It dismissed the claims of the congressional appellants on the additional ground of "equitable or remedial discretion," citing our decision in *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981). And it dismissed the remaining state claim for lack of pendent federal jurisdiction. *Sanchez-Espinoza v. Reagan,* 568 F.Supp. 596 (D.D.C.1983).

Without necessarily disapproving the District Court's conclusion that all aspects of the present case present a nonjusticiable political question, we choose not to resort to that doctrine for most of the claims. Since we find other bases for dismissing the suit—and bases which do not expand our jurisdiction by resolving the assertedly political question on its merits—we prefer to rest our affirmance of the District Court's judgment in most respects on different grounds. *See Proctor v. State Farm Mutual Automobile Insurance Co.,* 675 F.2d 308, 326 (D.C.Cir.), *cert. denied,* 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982). We proceed to discussion of appellants' seven causes of action in the five separate categories of analysis into which they fall.

## II

The Nicaraguan appellants allege three causes of action assertedly coming within the Alien Tort Statute, 28 U.S.C. § 1350 (1982). They state that the acts of the appellees "constitute torts in violation of the law of nations as evinced by [a number of international declarations and agreements]," "constitute violations of the tort law of Nicaragua, several States, and the District of Columbia," and "constitute violations of international law." Amended Complaint ¶¶ 128, 130, 140.

▮ The Alien Tort Statute provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." This obscure section of the Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 77 (Judge Friendly has called it "a kind of legal Lohengrin; ... no one seems to know whence it came," *ITT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir.1975)) may conceivably have been meant to cover only private, nongovernmental acts that are contrary to treaty or the law of nations—the most prominent examples being piracy and assaults upon ambassadors. *See Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 813–15 (D.C.Cir.1984) (Bork, J., concurring), *cert. denied,* —— U.S. ——, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). We are aware of no treaty that purports to make the activities at issue here unlawful when conducted by private individuals. As for the law of nations—so-called "customary international law," arising from "the customs and usages of civilized nations," *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900)—we conclude that this also does not reach private, non-

---

**3.** The complaint also lists an eighth cause of action, against the federal appellees for failure "to enforce the Neutrality Act and other federal criminal statutes relating to the maintenance of paramilitary training camps in the United States" in violation of their duty under art. II, § 3 of the Constitution, to "take Care that the Laws be faithfully executed." Appellants have not presented that issue for review in this appeal, and we deem it to have been abandoned. *See* Fed.R.App.P. 28(a); *Kizzier Chevrolet Co. v. General Motors Corp.,* 705 F.2d 322, 325 n. 2 (8th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 153, 78 L.Ed.2d 141 (1983).

state conduct of this sort for the reasons stated by Judge Edwards in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d at 791–96 (Edwards, J., concurring); *see also id.* at 807 (Bork, J., concurring). Assuming, however, that the Alien Tort Statute covers state acts as well, then it embraces this suit only insofar as the federal appellees [4] are sued in their official, as opposed to their personal, capacities—*i.e.*, to the extent that appellants are seeking to hold them to account for, or to prevent them from implementing in the future, *actions of the United States*. It would make a mockery of the doctrine of sovereign immunity if federal courts were authorized to sanction or enjoin, by judgments nominally against present or former Executive officers, actions that are, *concededly and as a jurisdictional necessity*, official actions of the United States. *Cf. Eminente v. Johnson*, 361 F.2d 73 (D.C.Cir.), *cert. denied*, 385 U.S. 929, 87 S.Ct. 287, 17 L.Ed.2d 211 (1966). Such judgments would necessarily "interfere with the public administration," *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947), or "restrain the government from acting, or ... compel it to act," *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949). These consequences are tolerated

when the officer's action is unauthorized because contrary to statutory or constitutional prescription, *see Malone v. Bowdoin*, 369 U.S. 643, 647, 82 S.Ct. 980, 983, 8 L.Ed.2d 168 (1962), but we think that exception can have no application when the basis for jurisdiction requires action authorized by the sovereign as opposed to private wrongdoing.[5] A waiver of sovereign immunity must therefore be found. Insofar as the claim for money damages is concerned, there is none. The Alien Tort Statute itself is not a waiver of sovereign immunity. *Canadian Transport Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir.1980).

With respect to claims against the federal appellees in their official capacity for *nonmonetary* relief, however, the waiver of the Administrative Procedure Act ("APA") is arguably available.[6] This provides that an action "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702 (1982). But all the bases for nonmonetary relief— including injunction, mandamus[7] and de-

---

**4.** Appellants suggest in their brief, though they do not clearly assert in their complaint, that the appellees other than the federal appellees were acting as agents of the United States. If that is accepted, then their actions are arguably brought within the terms of the Alien Tort Statute, but similarly brought within our ensuing analysis pertaining to action by officers of the United States.

**5.** Since the doctrine of foreign sovereign immunity is quite distinct from the doctrine of domestic sovereign immunity that we apply here, being based upon considerations of international comity, *see The Schooner Exchange v. McFaddon*, 11 U.S. 116, 135–36, 7 Cranch 116, 135–38, 3 L.Ed. 287 (1812); *National City Bank v. Republic of China*, 348 U.S. 356, 359, 75 S.Ct. 423, 426, 99 L.Ed. 389 (1955), rather than separation of powers, *see Gray v. Bell*, 712 F.2d 490, 511 (D.C.Cir.1983), it does not necessarily follow that an Alien Tort Statute suit filed against the officer of a foreign sovereign would have to be dismissed. Thus, nothing in today's decision

necessarily conflicts with the decision of the Second Circuit in *Filartiga v. Peña-Irala*, 630 F.2d 876 (2d Cir.1980).

**6.** We do not consider whether the actions involved here might come within one of the exceptions to the APA and its waiver, such as that for actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2) (1982).

**7.** Federal Rule of Civil Procedure 81(b) abolished the writ of mandamus in the district courts, but relief "in the nature of mandamus" may still be obtained through an appropriate action or motion under the practice prescribed in the federal rules. *See* 28 U.S.C. § 1361; 12 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3134 (1973). The principles that governed the former writ now govern attempts to secure similar relief. *See Haggard v. Tennessee*, 421 F.2d 1384, 1385 (6th Cir.1970); *Hammond v. Hull*, 131 F.2d 23, 25 (D.C.Cir.1942), *cert. denied*, 318 U.S. 777, 63 S.Ct. 830, 87 L.Ed. 1145 (1943).

claratory judgment—are discretionary. *See TVA v. Hill,* 437 U.S. 153, 193–94, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978) (injunction); *Whitehouse v. Illinois Central R.R.,* 349 U.S. 366, 373, 75 S.Ct. 845, 850, 99 L.Ed. 1155 (1955) (mandamus); *Brillhart v. Excess Insurance Co.,* 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942) (declaratory judgment). The APA specifically provides that its judicial review provision does not affect "the power or duty of the court to dismiss any action or deny relief on any ... appropriate legal or equitable ground." 5 U.S.C. § 702. At least where the authority for our interjection into so sensitive a foreign affairs matter as this are statutes no more specifically addressed to such concerns than the Alien Tort Statute and the APA, we think it would be an abuse of our discretion to provide discretionary relief.[8] *Cf. Adams v. Vance,* 570 F.2d 950 (D.C.Cir.1978). The support for military operations that we are asked to terminate has, if the allegations in the complaint are accepted as true, received the attention and approval of the President, the Secretary of State, the Secretary of Defense, and the Director of the CIA, and involves the conduct of our diplomatic relations with at least four foreign states—Nicaragua, Costa Rica, Honduras, and Argentina. Whether or not this is, as the District Court thought, a matter so entirely committed to the care of the political branches as to preclude our considering the issue at all, we think it at least requires the withholding of discretionary relief.

### III

■ The Nicaraguan appellants assert that the appellees' actions violate the fourth and fifth amendments to the United States Constitution.[9] We do not reach the question whether the protections of the Constitution extend to noncitizens abroad, *see Johnson v. Eisentrager,* 339 U.S. 763, 771, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950); *Pauling v. McElroy,* 278 F.2d 252, 254 n. 3 (D.C.Cir), *cert. denied,* 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960); *but see United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974), since we conclude that no relief is in any event available, and that this portion of the complaint therefore was properly dismissed under Fed.R.Civ.P. 12(b)(6).

Under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 396, 91 S.Ct. 1999, 2004, 29 L.Ed.2d 619 (1971), in appropriate situations the federal courts may fashion a damages remedy for violation of constitutional rights. The Supreme Court "has expressly cautioned, however, that such a remedy will not be available when 'special factors counselling hesitation' are present." *Chappell v. Wallace,* 462 U.S. 296, 298, 103 S.Ct. 2362, 2364, 76 L.Ed.2d 586 (1983) (quoting *Bivens,* 403 U.S. at 396, 91 S.Ct. at 2004). Those special factors, the Court has clarified, relate not to the merits of the particular remedy, but "to the question of who should decide whether such a remedy should be provided." *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 2412, 76 L.Ed.2d 648 (1983). Where, for example, the issue " 'involves a host of considerations that must be weighed and appraised,' " its resolution " 'is more appropriately for those who write the laws, rather than for those who interpret them.' " *Bush,* 103 S.Ct. at 2412 (quoting *United States v. Gilman,* 347 U.S. 507, 512–13, 74 S.Ct. 695, 698, 98 L.Ed. 898 (1954)). We have no doubt that these considerations of institutional competence preclude judicial creation of damage remedies here. Just as the special needs of

---

**8.** We note in this regard that the discretionary relief of declaratory judgment is, in a context such as this where federal officers are defendants, the practical equivalent of specific relief such as injunction or mandamus, since it must be presumed that federal officers will adhere to the law as declared by the court. Such equivalence of effect dictates an equivalence of criteria for issuance. *See Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688 (1971).

**9.** The complaint also asserted violation of the Nicaraguan appellants' alleged rights under art. I, § 8, cl. 11 of the Constitution, giving Congress the power to declare war. This extravagant claim has not been presented on appeal, and we deem it abandoned. *See supra* note 3.

the armed forces require the courts to leave to Congress the creation of damage remedies against military officers for allegedly unconstitutional treatment of soldiers, *see Chappell v. Wallace, supra,* so also the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad. The foreign affairs implications of suits such as this cannot be ignored—their ability to produce what the Supreme Court has called in another context "embarrassment of our government abroad" through "multifarious pronouncements by various departments on one question." *Baker v. Carr,* 369 U.S. 186, 226, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Whether or not the present litigation is motivated by considerations of geopolitics rather than personal harm, we think that as a general matter the danger of foreign citizens' using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.

The remaining relief appellants specifically request (injunction, mandamus, declaratory judgment and attorneys' fees), and any other "just and proper relief" we can conceive of, is discretionary, and for the reasons already stated cannot properly be provided. Accordingly, dismissal of the constitutional counts must be affirmed because of their failure to set forth a claim on which relief can be granted.

### IV

■ The Nicaraguan appellants seek damages for appellees' alleged violation of four statutes. Since none of those statutes explicitly provides a damage remedy, we must determine as to each whether it can fairly be implied. The focus of our inquiry, of course, "is on whether Congress intended to create a remedy.... The federal judiciary will not engraft a remedy on a

statute, no matter how salutary, that Congress did not intend to provide." *California v. Sierra Club,* 451 U.S. 287, 297, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981). Three of the statutes, the War Powers Resolution, 50 U.S.C. §§ 1541–48 (1982) & 50 U.S.C.A. § 1546a (West Supp.1985), the Hughes-Ryan Amendment, 50 U.S.C. § 413 (1982),[10] and the National Security Act of 1947, 61 Stat. 495, codified as amended in scattered sections of Titles 5 and 50 U.S.C. (1982), are singularly inappropriate for the implication of private damage actions, since they do not identify any "special class to be benefited," *Cannon v. University of Chicago,* 441 U.S. 677, 690, 99 S.Ct. 1946, 1954, 60 L.Ed.2d 560 (1979), but rather, "for the protection of the general public," *id.,* divide responsibility between the executive and legislative branches of government (the War Powers Resolution and Hughes-Ryan Amendment) or among the various agencies of the Executive (the National Security Act) in order to secure sound and efficient conduct of military and foreign affairs. The declarations of purpose in two of the statutes spell this out explicitly, *see* 50 U.S.C. § 1541(a) (War Powers Act); 50 U.S.C. § 401 (National Security Act), as does the Senate committee report on the third, *see* S.Rep. No. 730, 96th Cong., 2d Sess. 5, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4182, 4192, 4193. Neither the text not the legislative history of any of these enactments suggests an attempt to create private damage actions, which would be strange tools for resolution of interbranch disputes or allocation of intrabranch responsibilities, particularly in the sensitive fields of military and foreign affairs.

■ The last statute is a section of the Criminal Code that forbids preparations for "any military or naval expedition or enterprise ... against the territory or dominion of any foreign prince or state." 18 U.S.C. § 960 (1982) ("the Neutrality Act"). It provides a penalty of up to $3,000 in fines and

---

10. The Hughes-Ryan Amendment was a rider to the Intelligence Authorization Act for Fiscal Year 1981, Pub.L. No. 96–450, 94 Stat. 1975 (1980) (codified in scattered sections of Titles 10, 22 & 50 U.S.C. (1982)). *See id.,* Title V, § 501, 94 Stat. 1981.

up to three years in prison. Private rights of action are extremely unlikely to be created by " 'statutory language customarily found in criminal statutes.' " *National Treasury Employees' Union v. Campbell,* 654 F.2d 784, 790 (D.C.Cir.1981) (quoting *Cannon v. University of Chicago,* 441 U.S. at 690, 99 S.Ct. at 1954). It would be doubly difficult to find a private damage action within the Neutrality Act, since this would have the practical effect of eliminating prosecutorial discretion in an area where the normal desirability of such discretion is vastly augmented by the broad leeway traditionally accorded the Executive in matters of foreign affairs. *See United States v. Curtiss-Wright Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936).

Where standing obstacles can be overcome, *see United Presbyterian Church v. Reagan,* 738 F.2d 1375 (D.C.Cir. 1984), suits seeking relief other than money damages for Executive violation of these statutes may be brought under the judicial review provision of the Administrative Procedure Act, 5 U.S.C. § 702. As noted earlier, however, such nonmonetary relief is discretionary and would not properly be provided here.

### V

The congressional appellants allege two causes of action. First, they assert that the federal appellees have violated the so-called Boland Amendment, Pub.L. No. 97–377, § 793, 96 Stat. 1865 (1982), a rider to appropriations for Fiscal Year 1983 which forbids the provision of assistance by the CIA or the Department of Defense "to any group or individual, not part of a country's armed forces, for the purpose of overthrowing the Government of Nicaragua...." But the appropriations, and hence the operative effect of the limiting rider, expired on September 30, 1983, the end of the fiscal year. Since the congressional appellants seek relief of only prospective effect (declaratory judgment and injunction), we must dismiss this cause of action as moot.

The congressional appellants also allege that assistance to the Contras is tantamount to waging war, so that they "have been deprived of their right to participate in the decision to declare war" in violation of the war powers clause of the Constitution, art. I, § 8, cl. 11. Amended Complaint ¶ 136. Dismissal of this claim is required by our decision in *Crockett v. Reagan,* 720 F.2d 1355 (D.C.Cir.1983), which upheld dismissal of a similar claim by twenty-nine members of Congress relating to alleged military activity in El Salvador on the ground that the war powers issue presented a nonjusticiable political question.

### VI

The Florida appellants allege that the defendants have violated Florida nuisance law by maintaining "[a]t least five paramilitary training camps" in Florida. Amended Complaint ¶¶ 55, 142. Jurisdiction over this claim was founded on the doctrine of pendent jurisdiction, *see United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Since the federal claims supporting that jurisdiction were, as we have found, properly dismissed, this claim was properly dismissed as well, *see id.* at 726, 86 S.Ct. at 1139.

\*     \*     \*     \*     \*     \*

For the foregoing reasons, the judgment of dismissal is

*Affirmed.*

GINSBURG, Circuit Judge, concurring statement:

For the reasons well-stated by Justice Powell, concurring in the judgment in *Goldwater v. Carter,* 444 U.S. 996, 997–02, 100 S.Ct. 533, 534–37, 62 L.Ed.2d 428 (1979), I would dismiss the "war powers clause" claim for relief asserted by the congressional plaintiffs as not ripe for judicial review: "The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitu-

tional impasse." 444 U.S. at 997, 100 S.Ct. at 534.

Congress has formidable weapons at its disposal—the power of the purse and investigative resources far beyond those available in the Third Branch. But no gauntlet has been thrown down here by a majority of the Members of Congress. On the contrary, Congress expressly allowed the President to spend federal funds to support paramilitary operations in Nicaragua. Intelligence Authorization Act for Fiscal Year 1984, Pub.L. No. 98–212, § 775, 97 Stat. 1421, 1453 (1983). "If the Congress chooses not to confront the President, it is not our task to do so." 444 U.S. at 998, 100 S.Ct. at 534.