# Bill to Relocate United States Embassy from Tel Aviv to Jerusalem

The provisions of a bill that render the executive branch's ability to obligate appropriated funds conditional upon the construction and opening in Jerusalem of the United States Embassy to Israel invade exclusive presidential authorities in the field of foreign affairs and are unconstitutional.

May 16, 1995

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This is to provide you with our views on S. 770, 104th Cong. (1995), a bill introduced by Senator Dole and others, "[t]o provide for the relocation of the United States Embassy in Israel to Jerusalem, and for other purposes." The provisions of this bill that render the executive branch's ability to obligate appropriated funds conditional upon the construction and opening in Jerusalem of the United States Embassy to Israel invade exclusive presidential authorities in the field of foreign affairs and are unconstitutional.

The bill states that

[i]t is the policy of the United States that—

(1) Jerusalem should be recognized as the capital of the State of Israel;
(2) groundbreaking for construction of the United States Embassy in Jerusalem should begin no later than December 31, 1996; and
(3) the United States Embassy should be officially open in Jerusalem no later than May 31, 1999.

S. 770, § 3(a).

The bill requires that not more than fifty percent of the funds appropriated to the State Department for FY 1997 for "Acquisition and Maintenance of Buildings Abroad" may be obligated until the Secretary of State determines and reports to Congress that construction has begun on the site of the United States Embassy in Jerusalem. *Id.* § 3(b). Further, not more than fifty percent of the funds appropriated to the State Department for FY 1999 for "Acquisition and Maintenance of Buildings Abroad" may be obligated until the Secretary determines and reports to Congress that the United States Embassy in Jerusalem has officially opened. *Id.* § 3(c).

Of the funds appropriated for FY 1995 for the State Department and related agencies, not less than $5,000,000 "shall be made available until expended" for costs associated with relocating the United States Embassy in Israel to Jerusalem.

*Id.* § 4. Of the funds authorized to be appropriated in FY 1996 and FY 1997 for the State Department for "Acquisition and Maintenance of Buildings Abroad," not less than $25,000,000 (in FY 1996) and $75,000,000 (in FY 1997) "shall be made available until expended" for costs associated with, respectively, the relocation of the United States Embassy to Jerusalem, and the construction and relocation of the Embassy. *Id.* § 5(a), (b).

The Secretary is required to report to Congress not later than thirty days after enactment "detailing the Department of State's plan to implement this Act." *Id.* § 6. Beginning on January 1, 1996, and every six months thereafter, the Secretary is to report to Congress "on the progress made toward opening the United States Embassy in Jerusalem." *Id.* § 7.

It is well settled that the Constitution vests the President with the exclusive authority to conduct the Nation's diplomatic relations with other States. This authority flows, in large part, from the President's position as Chief Executive, U.S. Const. art. II, § 1, cl. 1, and as Commander in Chief, *id.* art. II, § 2, cl. 1. It also derives from the President's more specific powers to "make Treaties," *id.* art. II, § 2, cl. 2; to "appoint Ambassadors . . . and Consuls," *id.*; and to "receive Ambassadors and other public Ministers," *id.* art. II, § 3. The Supreme Court has repeatedly recognized the President's authority with respect to the conduct of diplomatic relations. *See, e.g., Department of Navy v. Egan,* 484 U.S. 518, 529 (1988) (the Supreme Court has "recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive'") (quoting *Haig v. Agee,* 453 U.S. 280, 293–94 (1981)); *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 705–06 n.18 (1976) ("[T]he conduct of [foreign policy] is committed primarily to the Executive Branch."); *United States v. Louisiana,* 363 U.S. 1, 35 (1960) (the President is "the constitutional representative of the United States in its dealings with foreign nations"); *see also Ward v. Skinner,* 943 F.2d 157, 160 (1st Cir. 1991) (Breyer, C.J.) ("[T]he Constitution makes the Executive Branch . . . primarily responsible" for the exercise of "the foreign affairs power."), *cert. denied,* 503 U.S. 959 (1992); *Sanchez-Espinoza v. Reagan,* 770 F.2d 202, 210 (D.C. Cir. 1985) (Scalia, J.) ("[B]road leeway" is "traditionally accorded the Executive in matters of foreign affairs."). Accordingly, we have affirmed that the Constitution "authorize[s] the President to determine the form and manner in which the United States will maintain relations with foreign nations." *Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports,* 16 Op. O.L.C. 18, 21 (1992).

Furthermore, the President's recognition power is exclusive. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 410 (1964) ("Political recognition is exclusively a function of the Executive."); *see also* Restatement (Third) of the Foreign Relations Law of the United States § 204 (1987) ("[T]he President has exclusive authority to recognize or not to recognize a foreign state or government, and to maintain or not to maintain diplomatic relations with a foreign

government.''). It is well established, furthermore, that this power is not limited to the bare act of according diplomatic recognition to a particular government, but encompasses as well the authority to take such actions as are necessary to make the power of recognition an effective tool of United States foreign policy. *United States v. Pink*, 315 U.S. 203, 229 (1942) (The authority to recognize governments ''is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition.'').

The proposed bill would severely impair the President's constitutional authority to determine the form and manner of the Nation's diplomatic relations. The bill seeks to effectuate the policy objectives that ''Jerusalem should be recognized as the capital of the State of Israel'' and that ''the United States Embassy should be officially open in Jerusalem no later than May 31, 1999.'' To those ends, it would prohibit the executive branch from obligating more than a fixed percentage of the funds appropriated to the State Department for ''Acquisition and Maintenance of Buildings Abroad'' in FY 1997 until the Secretary determines and reports to Congress that construction has begun on the site of the United States Embassy in Jerusalem. It would also prohibit the executive branch from obligating more than a fixed percentage of the funds appropriated for the same purpose for FY 1999 until the Secretary determines and reports to Congress that the United States Embassy in Jerusalem has ''officially opened.''

By thus conditioning the executive branch's ability to obligate appropriated funds, the bill seeks to compel the President to build and to open a United States Embassy to Israel at a site of extraordinary international concern and sensitivity. We believe that Congress cannot constitutionally constrain the President in such a manner.

In general, because the venue at which diplomatic relations occur is itself often diplomatically significant, Congress may not impose on the President its own foreign policy judgments as to the particular sites at which the United States' diplomatic relations are to take place. More specifically, Congress cannot trammel the President's constitutional authority to conduct the Nation's foreign affairs and to recognize foreign governments by directing the relocation of an embassy. This is particularly true where, as here, the location of the embassy is not only of great significance in establishing the United States' relationship with a single country, but may well also determine our relations with an entire region of the world. Finally, to the extent that S. 770 is intended to affect recognition policy with respect to Jerusalem, it is inconsistent with the exclusivity of the President's recognition power.

Our conclusions are not novel. With respect to the Foreign Relations Authorization Act, FY 1994 & 1995, Pub. L. No. 103–236, § 221, 108 Stat. 382, 421 (1994), which included provisions purporting to require the establishment of an office in Lhasa, Tibet, the President stated that he would ''implement them to the extent

consistent with [his] constitutional responsibilities.'' 1 *Pub. Papers of William J. Clinton* 807, 808 (1994). The Reagan Administration objected in 1984 to a bill to compel the relocation of the United States Embassy from Tel Aviv to Jerusalem, on the grounds that the decision was ''so closely connected with the President's exclusive constitutional power and responsibility to recognize, and to conduct ongoing relations with, foreign governments as to, in our view, be beyond the proper scope of legislative action.'' Letter for Dante B. Fascell, Chairman, Committee on Foreign Affairs, United States House of Representatives, from George P. Shultz, Secretary of State at 2 (Feb. 13, 1984). Again, in 1987, President Reagan stated that he would construe certain provisions of the Foreign Relations Authorization Act, FY 1988 & 1989, including those that forbade ''the closing of any consulates,'' in a manner that would avoid unconstitutional interference with the President's authority with respect to diplomacy. 2 *Pub. Papers of Ronald Reagan* 1541, 1542 (1987). Indeed, as long ago as 1876, President Grant declared in a signing statement that he would construe legislation in such a way as to avoid ''implying a right in the legislative branch to direct the closing or discontinuing of any of the diplomatic or consular offices of the Government,'' because if Congress sought to do so, it would ''invade the constitutional rights of the Executive.'' 7 *Messages and Papers of the Presidents* 377, 378 (James D. Richardson ed., 1898).

Finally, it does not matter in this instance that Congress has sought to achieve its objectives through the exercise of its spending power, because the condition it would impose on obligating appropriations is unconstitutional. *See United States v. Butler*, 297 U.S. 1, 74 (1936); 16 Op. O.L.C. at 28–29 (''As we have said on several prior occasions, Congress may not use its power over appropriation of public funds 'to attach conditions to Executive Branch appropriations requiring the President to relinquish his constitutional discretion in foreign affairs.' '') (quoting *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37, 42 n.3 (1990)) (quoting *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions*, 13 Op. O.L.C. 258, 261–62 (1989)).

For the above reasons, we believe that the bill's provisions conditioning appropriated funds on the building and opening of a United States Embassy in Jerusalem are unconstitutional.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*