# Section 235A of the Immigration and Nationality Act

Section 235A of the Immigration and Nationality Act requires the Attorney General to establish and maintain certain preinspection stations, provided the foreign countries concerned have consented to the establishment of such stations on their territory and provided that certain other preconditions have been satisfied.

Section 235A does not oblige the Attorney General or any other executive branch official to enter into diplomatic negotiations with foreign countries in order to obtain their consent to the establishment of preinspection stations on their territory, and it does not require that preinspection stations be established before the preconditions have been satisfied. Accordingly, section 235A does not unconstitutionally infringe on the President's authority to conduct diplomatic relations.

October 23, 2000

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
IMMIGRATION AND NATURALIZATION SERVICE

You have requested our opinion whether section 235A of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1225a, which requires the Attorney General to establish and maintain immigration preinspection stations in certain foreign airports, unconstitutionally infringes on the President's authority to conduct diplomatic relations with other nations. As we explain more fully below, we believe that section 235A requires the Attorney General to establish and maintain certain preinspection stations provided the foreign countries concerned have consented to the establishment of such stations on their territory and provided that certain other preconditions have been satisfied. Section 235A does not, however, oblige the Attorney General or any other executive branch official to enter into diplomatic negotiations with foreign countries in order to obtain that consent, and it does not require that preinspection stations be established before the preconditions have been satisfied.

## BACKGROUND

Section 235A was added to the INA by section 123 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104–208, 110 Stat. 3009–546, 3009–560 ("IIRIRA"). It mandates the establishment of immigration "preinspection" stations at certain foreign airports.[1] Prior to the passage of section 235A, the INA authorized, but did not require, the establishment of preinspection stations, and the relevant statutory provisions were neither modified

---

[1] "Preinspection" generally refers to immigration inspection procedures conducted at foreign ports of embarkation by United States authorities for passengers seeking entry into the United States In some instances, immigration preinspection is accompanied by U S. Customs clearance as well. Sites containing both immigration and customs inspection are generally called "preclearance" sites See, e.g., Agreement Between the Government of the United States of America and the Government of Canada on Air Transport Preclearance, May 8, 1974, art I(a), 25 U S T 763 ("U S.-Canada Agreement"). Section 235A refers only to preinspection.

nor repealed by passage of section 235A. Specifically, under INA § 103(a)(7), 8 U.S.C. § 1103(a)(7), the Attorney General "may, with the concurrence of the Secretary of State, establish offices of the [INS] in foreign countries." Pursuant to that authority, the INS established and maintains preinspection stations at airports in Canada, Ireland, Bermuda, and several other ports of embarkation in the Caribbean. Establishing those stations involved entering into diplomatic negotiations with the foreign countries involved. *See, e.g.*, U.S.-Canada Agreement, 25 U.S.T. at 763.

In contrast, section 235A requires (and does not merely authorize) the establishment of preinspection stations. Section 235A(a)(1), which is entitled "New Stations," provides:

> Subject to paragraph (5), not later than October 31, 1998, the Attorney General, in consultation with the Secretary of State, shall establish and maintain preinspection stations in at least 5 of the foreign airports that are among the 10 foreign airports which the Attorney General identifies as serving as last points of departure for the greatest numbers of inadmissible alien passengers who arrive from abroad by air at ports of entry within the United States. Such preinspection stations shall be in addition to any preinspection stations established prior to the date of the enactment of such Act [September 30, 1996].

Additionally, section 235A(a)(4), which is entitled "Additional Stations," provides:

> Subject to paragraph (5), not later than October 31, 2000, the Attorney General, in consultation with the Secretary of State, shall establish preinspection stations in at least 5 additional foreign airports which the Attorney General, in consultation with the Secretary of State, determines, based on the data compiled under paragraph (3) and such other information as may be available, would most effectively reduce the number of aliens who arrive from abroad by air at points of entry within the United States who are inadmissible to the United States. Such preinspection stations shall be in addition to those established prior to the date of the enactment of such Act [September 30, 1996] or pursuant to paragraph (1).[2]

---

[2] Section 235A(a)(3), which is referenced in section 235A(a)(4), provides
Not later than November 1, 1997, and each subsequent November 1, the Attorney General shall compile data identifying —
(A) the foreign airports which served as last points of departure for aliens who arrived by air at United States ports of entry without valid documentation during the preceding fiscal years,
(B) the number and nationality of such aliens arriving from each such foreign airport, and

Continued

Finally, sections 235A(a)(1) and (4) are both "[s]ubject to" section 235A(a)(5), which identifies certain "[c]onditions":

> Prior to the establishment of a preinspection station the Attorney General, in consultation with the Secretary of State, shall ensure that —
> (A) employees of the United States stationed at the preinspection station, and their accompanying family members will receive appropriate protection;
> (B) such employees and their families will not be subject to unreasonable risks to their welfare and safety; and
> (C) the country in which the preinspection station is to be established maintains practices and procedures with respect to asylum seekers and refugees in accordance with the Convention Relating to the Status of Refugees (done at Geneva, July 28, 1951), or the Protocol Relating to the Status of Refugees (done at New York, January 31, 1967), or that an alien in the country otherwise has recourse to avenues of protection from return to persecution.

These requirements stand as conditions precedent to the statutory duty to establish any of the preinspection stations called for by sections 235A(a)(1) and (4): the Attorney General must ensure that they are met "[p]rior to the establishment of a preinspection station," INA § 235A(a)(5), and the statutory requirement that preinspection stations be established by defined dates is "[s]ubject to" these preconditions. *Id.* § 235A(a)(1) and (4).[3]

After the enactment of section 235A, a working group consisting of representatives from the INS and the Department of State was established to identify potential sites for preinspection stations. The working group ultimately identified sixteen potential sites (in fifteen countries) for preinspection stations that met the criteria set forth in section 235A.[4] The Commissioner of the INS sent a letter to the Department of State requesting that it ascertain, *inter alia*, whether countries containing the sites identified by the working group were willing to allow preinspection stations on their territory. The State Department then instructed

---

(C) the primary routes such aliens followed from their country of origin to the United States

[3] Preinspection stations may be established for a variety of reasons, including passenger convenience *See, e g*, U.S.-Canada Agreement, preamble, 25 U.S T at 764 (stating that "preclearance facilitates air travel between the two countries") It is clear from the text of section 235A that the preinspection stations it contemplates are intended to decrease the number of inadmissible aliens entering the United States The legislative history confirms this point *See* H.R. Rep No 104–469, 177–78 (1996) ("[P]assengers refused permission [at a preinspection station] to board [an airplane bound for the United States], on the ground that they do not have valid documents to be admitted or are otherwise inadmissible, will be prevented from even reaching a U.S port of entry, thus reducing the burden on INS inspection facilities and the likelihood that unauthorized aliens will enter the U S ")

[4] Those sites are: London, Mexico City, Tokyo, Amsterdam, Frankfurt, Paris, Taipei, Seoul, Caracas, Santo Domingo, Kingston, Sao Paolo, Rome, Guadalajara, Guatemala City, and Port au Prince *See* Memorandum for Chris Sale, Deputy Commissioner, INS, from Michael D. Cronin, Assistant Commissioner, INS, *Re· Preinspection Working Group* at 5–6 (July 22, 1997).

American embassies and consulates in the relevant countries to explore that issue with host country officials. In a letter dated January 20, 1998, the Assistant Secretary of State for Consular Affairs reported that "only one [country] (Jamaica) gave preliminary indication that it would support establishment of an INS preinspection station." Letter for Hon. Doris Meissner, Commissioner, INS, from Mary A. Ryan, Assistant Secretary for Consular Affairs, Dept. of State at 2 (Jan. 20, 1998) ("Ryan Letter").[5] To date, no preinspection stations have been established pursuant to section 235A.

## DISCUSSION

To determine whether section 235A unconstitutionally intrudes on the President's authority to conduct foreign relations, we begin by identifying section 235A's precise requirements. For present purposes, this involves interpreting sections 235A(a)(1), (4), and (5). The first two provisions stipulate how many preinspection stations are to be established and maintained, the criteria those stations must meet, and the dates by which they are to be established. The third specifies certain conditions that must be met before a preinspection station is established.

Sections 235A(a)(1) and (4) both direct the Attorney General, in consultation with the Secretary of State, to "establish" (and, in the case of section 235A(a)(1), "maintain") preinspection stations meeting certain criteria. Section 235A(a)(1) provides that, by October 31, 1998, the Attorney General "shall establish and maintain preinspection stations in at least 5 of the foreign airports that are among the 10 foreign airports which the Attorney General identifies as serving as last points of departure for the greatest numbers of inadmissible alien passengers who arrive from abroad by air at ports of entry within the United States." *Id.* Section 235A(a)(4) provides that, by October 31, 2000, she "shall establish preinspection stations in at least 5 additional foreign airports which the Attorney General, in consultation with the Secretary of State, determines, based on the data compiled under paragraph (3) and such other information as may be available, would most effectively reduce the number of aliens who arrive from abroad by air at points of entry within the United States who are inadmissible to the United States." *Id.* Sections 235A(a)(1) and (4) thus appear to contemplate a two-step process. First, the Attorney General is to identify potential sites for preinspection stations that meet the criteria set out in the relevant section. Second, she is to establish such stations at a minimum number of sites by the dates prescribed.

---

[5] The Ryan Letter noted that "[o]ne country (Dominican Republic) indicated it might be willing to allow a preinspection station, but only if full preclearance was allowed, i.e customs inspections as well." Ryan Letter at 2 The Ryan Letter further explained that fourteen countries were "queried " *Id* at 2. As to the fifteenth country, Guatemala, the Ryan Letter explained that "[o]ur embassy in Guatemala has not yet been able to obtain an initial reaction from authorities in that country." *Id.*

Additionally, however, sections 235A(a)(1) and (4) both provide that their requirements are "[s]ubject to" section 235A(a)(5), which, in turn, sets out certain conditions that must be met before a preinspection station is established. *See supra* p. 279 (quoting section 235A(a)(5)). The ordinary meaning of "subject to" includes "governed or affected by." *Black's Law Dictionary* 1425 (6th ed. 1990). Thus, sections 235A(a)(1) and (4), including the deadlines they prescribe, are "governed or affected by" the conditions set out in section 235A(a)(5).[6] Once the Attorney General identifies a potential site for a preinspection station, the requirement that it be "established" by a particular date does not take effect until the Attorney General is able to ensure that the site meets section 235A(a)(5)'s conditions.

Section 235A does not specify precisely how the Attorney General is to ensure that the sites she selects for preinspection stations meet section 235A(a)(5)'s conditions or how she is to go about establishing and maintaining such stations once they meet those conditions. Because the preinspection stations are to be located in foreign countries, establishing those stations is not entirely within the control of the Attorney General or, indeed, the executive branch as a whole. Rather, preinspection stations can only be established after the United States obtains the consent of the foreign countries concerned. *See, e.g.*, U.S.-Canada Agreement, *supra*.[7]

For two reasons, we do not read section 235A as requiring the executive branch to seek or obtain such consent. First, such a reading would impose on the executive branch the obligation to achieve outcomes beyond its control. While the Executive may negotiate with foreign sovereigns in an effort to obtain their consent to the establishment of preinspection stations within their territory, it is not within the Executive's power to ensure that such consent is actually given. Similarly, the Attorney General's ability to ensure that section 235A(a)(5)'s conditions are met depends at least in part on the cooperation of the relevant foreign government, cooperation that she cannot guarantee. Providing "appropriate protection" to federal employees working at preinspection stations, protecting those employees and their families from "unreasonable risks to their welfare and safety," and ensuring that aliens in a foreign country receive appropriate "protection from return to persecution" are all undertakings that require the cooperation and participation of the foreign sovereign concerned. *Id.* Without that cooperation and participation, it is not possible for the Attorney General herself either to ensure

---

[6] *Cf American Rivers v. FERC*, 201 F 3d 1186, 1204 (9th Cir. 2000) ("We therefore interpret 'subject to paragraph (2)' to mean precisely what it says subsection 10(j)(1) is governed or affected by subsection 10(j)(2) ")

[7] This is true both as a practical matter and as a matter of customary international law Under the latter, it is generally well-settled that an agent of a state may not act on the state's behalf within foreign territory without the consent of the foreign sovereign *See, e.g.*, Ian Brownlie, *Principles of Public International Law* 306–07 (3d ed 1979); Hans Kelsen, *Principles of International Law* 317–18 (2d ed 1966) ("That the territory enclosed by the boundaries of a state legally belongs to this state or — as it is usually characterized — that it is under the territorial supremacy or sovereignty of this state means that all individuals staying on this territory are, in principle, subjected to the legal power of that state and only of that state.")

that section 235A(a)(5)'s conditions are met or to establish and maintain preinspection stations as required by sections 235A(a)(1) and (4).

We presume that section 235A is not intended to demand the impossible of the Attorney General. *See McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000) ("It is a flawed and unreasonable construction of any statute to read it in a manner that demands the impossible."); *Ambassadors and other Public Ministers of the United States*, 7 Op. Att'y Gen. 186, 218 (1855) (Cushing, Att'y Gen.) ("[I]t is unreasonable to presume in any circumstances . . . that Congress intended to enact what is unreasonable."). Accordingly, we do not read section 235A as requiring the executive branch to obtain either foreign countries' consent to the establishment of preinspection stations or their cooperation in ensuring that section 235A(a)(5)'s conditions are met with respect to those stations.

Second, we do not read section 235A to require the Executive to enter into diplomatic negotiations to obtain foreign countries' consent to the establishment of preinspection stations, because such a requirement would unconstitutionally infringe on the President's foreign affairs power. The Constitution commits to the President the responsibility for conducting the nation's foreign affairs.[8] That responsibility includes the " 'exclusive authority to determine the time, scope, and objectives' " of all international negotiations. *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37, 41 (1990) (quoting 2 Pub. Papers of Ronald Reagan 1541, 1542 (1987) (President Reagan's statement on signing the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)). If section 235A were construed to require the Executive to negotiate with foreign countries in an attempt to obtain their consent to the establishment of preinspection stations, it would unconstitutionally intrude on that exclusive authority. Such a reading would run afoul of the principle that Congress may not require the Executive to "initiate discussion with foreign nations" or "order[ ] the Executive to negotiate and enter into treaties" or other types of international agreements. *Earth Island Inst. v. Christopher*, 6 F.3d 648, 652–53 (9th Cir. 1993); *see* 2 Pub. Papers of William J. Clinton 1685, 1688 (1999) (President Clinton's statement on signing the National Defense Authorization Act for Fiscal Year 2000) ("Congress may not direct that the President initiate discussions or negotiations with foreign governments."). It would also impermissibly specify the precise subject matter of the Executive's communications with foreign governments. *See id.* at 2035, 2036 (President Clinton's statement on signing Legislation to Locate and Secure the

---

[8] *See* U.S. Const art II, §§ 1–3, *Department of Navy v. Egan*, 484 U.S. 518, 529 (1988) (the Supreme Court has "recognized 'the generally accepted view that foreign policy [i]s the province and responsibility of the Executive' ") (quoting *Haig v Agee*, 453 U S 280, 293–94 (1981)), *Alfred Lord Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 705–06 n.18 (1976) ("[T]he conduct of [foreign policy] is committed primarily to the Executive Branch."); *United States v Louisiana*, 363 U S 1, 35 (1960) (the President is "the constitutional representative of the United States in its dealings with foreign nations"), *Sanchez-Espinoza v Reagan*, 770 F.2d 202, 210 (D.C Cir. 1985) (Scalia, J.) ("[B]road leeway" is "traditionally accorded the Executive in matters of foreign affairs."); Thomas Jefferson, *Opinion on the Powers of the Senate Respecting Diplomatic Appointments* (Apr. 24, 1790), *in* 16 *The Papers of Thomas Jefferson* 378, 379 (Julian P Boyd ed. 1961) ("The transaction of business with foreign nations is Executive altogether.").

Return of Zachary Baumel, a United States Citizen, and Other Israeli Soldiers Missing in Action) ("To the extent that this provision can be read to direct the Secretary of State to take certain positions in communications with foreign governments, it interferes with my sole constitutional authority over the conduct of diplomatic negotiations."); *2 Pub. Papers of William J. Clinton* 1815, 1815 (1996) (President Clinton's statement on signing the Sustainable Fisheries Act) ("Under our Constitution, it is the President who articulates the Nation's foreign policy and who determines the timing and subject matter of our negotiations with foreign nations.").[9] Accordingly, because section 235A does not expressly require the Executive to negotiate with foreign countries on the topic of preinspection stations, and because such a requirement would violate the constitutional separation of powers, we conclude that the statute should not be construed to so require.[10]

## CONCLUSION

In sum, we conclude that under section 235A, the Attorney General is required to identify certain potential sites for preinspection stations that fit the criteria set forth in sections 235A(a)(1) and (4). Before any such station is established, she is also required to ensure that the conditions prescribed in section 235A(a)(5) are satisfied. A condition precedent both to the satisfaction of section 235A(a)(5)'s conditions and to the actual establishment of any preinspection station is that the foreign government concerned agree to the establishment of the station. Construing section 235A as requiring the executive branch to fulfill that condition would both oblige the Executive to achieve outcomes beyond its control[11] and infringe on the Executive's broad authority over foreign affairs. Accordingly, we do not read

---

[9] *See also Issues Raised by Foreign Relations Authorization Bill*, 14 Op O L C at 41 ("The President is the constitutional representative of the United States with regard to foreign affairs He manages our concerns with foreign nations, and must necessarily be most competent to determine when, how, *and upon what subjects* negotiations may be urged with the greatest prospect of success.") (emphasis added) (quoting Reports of the Senate Committee on Foreign Relations, S. Doc. No. 231, pt 8, 56th Cong., 2d Sess. 24 (1901)); H. Jefferson Powell, *The President's Authority Over Foreign Affairs· An Executive Branch Perspective*, 67 Geo. Wash L Rev. 527, 558 (1999) ("[T]he executive's power over negotiations vests in it the discretion to determine the goals as well as the modes of diplomacy.").

[10] Our approach on this point is consistent with the Supreme Court's admonition to interpret statutes so as to avoid constitutional questions where possible. *See Jones v. United States*, 524 U.S. 848, 857 (2000) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter ") (quoting *United States ex rel Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909)); *Jones v. United States*, 526 U S. 227, 239 (1999); *Califano v. Yamasaki*, 442 U S. 682, 693 (1979), *Crowell v Benson*, 285 U S 22, 62 (1932), *cf. Ashwander v TVA*, 297 U S 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.")

[11] We note that executive branch officials have, since the passage of section 235A, raised the issue of preinspection stations with a number of foreign governments After a joint INS-Department of State working group identified sixteen potential sites for preinspection stations, the State Department instructed American embassies and consulates in the countries concerned to explore the preinspection issue with host country officials. *See supra* pp 279–80 Only one of the countries queried gave preliminary indication that it would support the establishment of a preinspection station within its territory *See supra* pp 279–80 & note 5; Ryan Letter at 2 Without that support, the establishment of preinspection stations in those countries does not appear possible.

section 235A as requiring the Executive either to seek or to obtain the consent of foreign countries to the establishment of preinspection stations within their territory.

RANDOLPH D. MOSS
*Assistant Attorney General*
*Office of Legal Counsel*