# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 24, 2015

Lyle W. Cayce
Clerk

————

No. 11-50792

————

JESUS C. HERNANDEZ, Individually and as the surviving father of Sergio Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio Adrian Hernandez Guereca; MARIA GUADALUPE GUERECA BENTACOUR, Individually and as the surviving mother of Sergio Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio Adrian Hernandez Guereca,

   Plaintiffs - Appellants

v.

UNITED STATES OF AMERICA;  UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES BUREAU OF CUSTOMS AND BORDER PROTECTION; UNITED STATES BORDER PATROL; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT AGENCY; UNITED STATES DEPARTMENT OF JUSTICE,

   Defendants - Appellees

-------------------------------------------------------------------------------------------------

CONS w/  12-50217

JESUS C. HERNANDEZ, Individually and as the surviving father of Sergio Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio Adrian Hernandez Guereca; MARIA GUADALUPE GUERECA BENTACOUR, Individually and as the surviving mother of Sergio Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio Adrian Hernandez,

   Plaintiffs - Appellants

v.

JESUS MESA, JR.,

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

Defendant - Appellee

-------------------------------------------------------------------------------------------------

CONS w/  12-50301

JESUS C. HERNANDEZ, Individually and as the surviving father of Sergio Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio Adrian Hernandez Guereca; MARIA GUADALUPE GUERECA BENTACOUR, Individually and as the surviving mother of Sergio Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio Adrian Hernandez,

         Plaintiffs - Appellants

v.

RAMIRO CORDERO; VICTOR M. MANJARREZ, JR.,

         Defendants - Appellees

————————

Appeals from the United States District Court
for the Western District of Texas

————————

Before STEWART, Chief Judge, and JOLLY, DAVIS, JONES, SMITH, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, and COSTA, Circuit Judges.[*]

---

[*] Judge DeMoss was a member of the panel and, as a senior judge, elected to participate in the en banc proceedings pursuant to 28 U.S.C. § 46(c) and 5th Circuit Rule 35.6. Although Judge DeMoss participated in the oral argument and the court's deliberations, he subsequently retired from the court, effective April 16, 2015. Before retiring, Judge DeMoss authored the following special concurrence, which would have been issued if he were still a member of the court:

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

PER CURIAM:

We rehear this matter en banc, *see Hernandez v. United States*, 771 F.3d 818 (5th Cir. 2014) (per curiam) (on petitions for rehearing en banc), to resolve whether, under facts unique to this or any other circuit, the individual defendants in these consolidated appeals are entitled to qualified immunity. Unanimously concluding that the plaintiffs fail to allege a violation of the Fourth Amendment, and that the Fifth Amendment right asserted by the plaintiffs was not clearly established at the time of the complained-of incident, we affirm the judgment of dismissal.

The facts and course of proceedings are accurately set forth in the panel majority opinion of Judge Prado, *Hernandez v. United States*, 757 F.3d 249, 255−57 (5th Cir. 2014). We conclude that the panel opinion rightly affirms the dismissal of Hernandez's claims against the United States, *id.* at 257–59, and against Agent Mesa's supervisors, *id.* at 280, and we therefore REINSTATE Parts I, II, and VI of that opinion. We additionally hold that pursuant to *United States v. Verdugo–Urquidez*, 494 U.S. 259 (1990), Hernandez, a Mexican citizen who had no "significant voluntary connection" to the United States, *id.* at 271, and who was on Mexican soil at the time he was shot, cannot assert a claim under the Fourth Amendment.

The remaining issue for the en banc court is properly described as whether "the Fifth Amendment . . . protect[s] a non-citizen with no connections

---

HAROLD R. DeMOSS, JR., Circuit Judge, concurring in part and concurring in the judgment:

I concur in the en banc court's reinstatement of Parts I, II, and VI of the panel's opinion. Furthermore, I concur in the en banc court's assessment that *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), precludes a Fourth Amendment claim on the facts of this case. As to the Fifth Amendment claim, I concur in the judgment of the en banc court for the reasons stated in my dissent from the panel opinion. *See Hernandez v. United States*, 757 F.3d 249, 281-82 (5th Cir. 2014) (DeMoss, J., concurring in part and dissenting in part).

to the United States who suffered an injury in Mexico where the United States has no formal control or de facto sovereignty." *Id.* at 281–82 (DeMoss, J., concurring in part and dissenting in part). To underscore the seriousness of the tragic incident under review, we elaborate on that description only to note that the injury was the death of a teenaged Mexican national from a gunshot fired by a Border Patrol agent standing on U.S. soil.

To decide the assertion of qualified immunity made by defendant Agent Mesa, regarding the plaintiffs' Fifth Amendment claim, the court avails itself of the latitude afforded by *Pearson v. Callahan*: "The judges of the . . . courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. 223, 236 (2009) (overruling *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The prongs referred to are familiar: "First, a court must decide whether the facts . . . alleged . . . make out a violation of a constitutional right. . . . Second, if [so], the court must decide whether the right at issue was 'clearly established' at the time of [the] alleged misconduct." *Id.* at 232. "Qualified immunity is applicable unless [both prongs are satisfied]." *Id.*

The panel opinion correctly describes the substantive-due-process claim as "that Agent Mesa showed callous disregard for Hernandez's Fifth Amendment rights by using excessive, deadly force when Hernandez was unarmed and presented no threat." *Hernandez*, 757 F.3d at 267. The question is whether, under the unique facts and circumstances presented here, that right was "clearly established."

The Supreme Court has carefully admonished that we are "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011). To the contrary, a right is clearly established only where "it would be clear to a reasonable officer that his conduct was unlawful

in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (quoting *Saucier*, 533 U.S. at 202) (internal quotation marks omitted). The question here is whether the general prohibition of excessive force applies where the person injured by a U.S. official standing on U.S. soil is an alien who had no significant voluntary connection to, and was not in, the United States when the incident occurred. No case law in 2010, when this episode occurred, reasonably warned Agent Mesa that his conduct violated the Fifth Amendment.

Although the en banc court is somewhat divided on the question of whether Agent Mesa's conduct violated the Fifth Amendment, the court, with the benefit of further consideration and en banc supplemental briefing and oral argument, is unanimous in concluding that any properly asserted right was not clearly established to the extent the law requires. The strongest authority for the plaintiffs may be *Boumediene v. Bush*, which addressed whether the Suspension Clause of the U.S. Constitution applied to aliens detained outside the United States at the U.S. Naval Base in Guantanamo Bay, Cuba. 553 U.S. 723, 732–33 (2008). Although the Court drew on cases from contexts other than habeas corpus, *see id.* at 755–64 (discussing the Court's precedents on "the Constitution's extraterritorial application," including, *inter alia*, the *Insular Cases*, *In re Ross*, 140 U.S. 453 (1891), *Reid v. Covert*, 354 U.S. 1 (1957), and *Verdugo–Urquidez*, 494 U.S. 259), it expressly limited its holding to the facts before it, *see id.* at 795 ("Our decision today holds only that petitioners before us are entitled to seek the writ; that the [Detainee Treatment Act] review procedures are an inadequate substitute for habeas corpus; and that petitioners in these cases need not exhaust the review procedures in the Court of Appeals before proceeding with their habeas actions in the District Court."). Accordingly, nothing in that opinion presages, with the directness that the "clearly established" standard requires, whether the Court would extend the

territorial reach of a different constitutional provision—the Fifth Amendment—and would do so where the injury occurs not on land long controlled by the United States, but on soil that is indisputably foreign and beyond the United States' territorial sovereignty. By deciding this case on a ground on which the court is in consensus, we bypass that issue by giving allegiance to "the general rule of constitutional avoidance." *Callahan*, 555 U.S. at 241.

"There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237. Reasonable minds can differ on whether *Boumediene* may someday be explicitly extended as the plaintiffs urge. That is the chore of the first prong of the qualified-immunity test, which we do not address.

The alleged right at issue was not clearly established, under these facts, in 2010.

The judgment of dismissal is AFFIRMED.

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

EDITH H. JONES, Circuit Judge, joined by SMITH, CLEMENT, and OWEN, Circuit Judges, concurring:

The court has unfortunately taken the path of least resistance. We hold unanimously that Agent Mesa has qualified immunity from this suit for a Fifth Amendment substantive due process violation because he did not violate any clearly established rights flowing from that Amendment. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009). This compromise simply delays the day of reckoning until another appellate panel revisits non-citizen tort claims for excessive force resting on extraterritorial application of the United States Constitution. Ongoing incursions across our national borders and our nation's applications of force abroad ensure that other lawsuits will be pursued. We should discourage this litigation before it takes root.

Because it is clear that United States constitutional rights do not extend to aliens who (a) lack any connection to the United States and (b) are injured on foreign soil, I would also resolve this appeal on the first prong of qualified immunity analysis. *See id.* at 236, 129 S. Ct. at 818 ("In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.").[1]

Whether a constitutional violation occurred here is a straightforward inquiry with a definite answer. First, if the plaintiffs have a constitutional claim at all, it arises under the Fourth Amendment, not the Fifth. *See Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1870-71 (1989). This en banc court re-confirms, however, that the Fourth Amendment protects only aliens

---

[1] The en banc court did not consider whether, even if a constitutional claim had been stated, a tort remedy should be crafted under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971). Our en banc opinion neither assumes nor decides that question.

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

with "significant voluntary connection[s]" to this country. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271, 110 S. Ct. 1056, 1064 (1990). Because Hernandez had no such prior connections, the Fourth Amendment claim fails.

Additionally, substantive due process under the Fifth Amendment does not offer a fallback claim here, not least because of the expressly limited reach of the Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723, 128 S. Ct. 2229 (2008). Judge DeMoss's dissent from the panel opinion aptly expressed incredulity about extraterritorial application of the Fifth Amendment:

> If the fact that the United States exerts and has exerted powerful influence over northern Mexico, justifies application of the Fifth Amendment in a strip along the border, how wide is that strip? Is the Fifth Amendment applicable in all of Ciudad Juarez or even the entire state of Chihuahua? Ultimately, the majority's approach devolves into a line drawing game which is entirely unnecessary because there is a border between the United States and Mexico.

*Hernandez v. United States*, 757 F.3d 249, 281 (5th Cir. 2014) (DeMoss, J., concurring in part and dissenting in part) (internal quotation marks and citation omitted).

I also feel obliged to comment on the plaintiffs' Alien Tort Statute ("ATS") claim against the United States, which has been rejected by the panel, by the unanimous compromise en banc opinion, and indeed by every other circuit court of appeals.[2] A concurring opinion here arguably supports the assertion

---

[2] *See Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1174 (D.C. Cir. 1994) (rejecting the argument that *jus cogens* violations implicitly waive sovereign immunity under the Foreign Sovereign Immunities Act); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 718-19 (9th Cir. 1992) (same); *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968-69 (4th Cir. 1992) (rejecting plaintiffs' argument that the ATS waived the United States' sovereign immunity); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985) (holding that "[t]he Alien Tort Statute itself is not a waiver of sovereign immunity").

8

of nebulous claims for violations of "*jus cogens*" and blithely suggests that the United States' sovereign immunity may be ineffective in American courts against such claims. Among the many troubling implications of the separate opinion, it turns on its head the Supreme Court's obvious reluctance to expand federal judges' authority to import customary international law theories into domestic tort law without careful articulation and severe limitations or Congressional action. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 732, 124 S. Ct. 2739, 2765-66 (2004) (plaintiff's claim for "arbitrary arrest and detention" failed to state a violation of the law of nations with requisite "definite content and acceptance among civilized nations"); *Kiobel v. Royal Dutch Petroleum Co.*, ___ U.S. ___, 133 S. Ct. 1659, 1669 (2013) (presumption against extraterritoriality applies to Alien Tort Statute).

## I.     The Fourth Amendment, not the Fifth, Controls

The plaintiffs characterized their claims as arising under either the Fifth or the Fourth Amendment. But on these facts, they can only have a Fourth Amendment claim. Constitutional rights are not interchangeable. When a litigant asserts multiple constitutional claims arising from the same conduct, we must "identify[] the specific constitutional right allegedly infringed . . . ." *Graham*, 490 U.S. at 394, 109 S. Ct. at 1870. If it becomes apparent that "a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.' " *Albright v. Oliver*, 510 U.S. 266, 273, 114 S. Ct. 807, 813 (1994) (quoting *Graham*, 490 U.S. at 395, 109 S. Ct. at 1871) (internal quotation marks and footnote omitted). In essence, the specific trumps the general. This is especially true when a plaintiff brings both Fourth and Fifth Amendment claims asserting law enforcement misconduct. The Court has emphatically stated that "*all* claims that law enforcement officers

have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham*, 490 U.S. at 395, 109 S. Ct. at 1871 (emphasis in original). Accordingly, substantive due process analysis is appropriate only if the plaintiffs' claim is not "covered by" the Fourth Amendment. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843, 118 S. Ct. 1708, 1715 (1998) (applying substantive due process where the passenger of a motorcyclist being pursued by police was killed).[3]

Agent Mesa undoubtedly seized Hernandez. A seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97, 109 S. Ct. 1378, 1381 (1989) (emphasis omitted). Law enforcement shootings are also covered by the Fourth Amendment because "there can be no question that apprehension by the use of deadly force is a seizure[.]" *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699 (1985). The plaintiffs' complaint alleges that Agent Mesa intentionally shot and killed Hernandez, thus terminating his "freedom of movement through means intentionally applied." *Brower*, 489 U.S. at 596-97, 109 S. Ct. at 1381. Under governing law, if the plaintiffs have any claim at all, it arises from the Fourth, not the Fifth Amendment.

---

[3] The plaintiffs argue that *Graham* is inapplicable here because its rule only applies to "free citizens." *Graham* does say all "seizure[s] of [] free citizen[s] should be analyzed under the Fourth Amendment . . . ." 490 U.S. at 395, 109 S. Ct. at 1871. But the Court could not have intended to give non-citizens the ability to pursue claims under the more nebulous "substantive due process" standard, while limiting American citizens to the Fourth Amendment's reasonableness test. Nothing in *Graham* (other than the above quoted language) supports such an inference. Taken in context, *Graham*'s reference to "free citizens" was intended to distinguish the scope of protection for "free citizens" from the rights accorded pretrial detainees (under the Fourteenth Amendment) and criminal convicts (under the Eighth Amendment). *See Lewis*, 523 U.S. at 843, 118 S. Ct. at 1715.

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

## II.    The Non-Extraterritoriality of the Fourth Amendment

Although the Fourth Amendment "covers" the plaintiffs' claim, Hernandez did not automatically enjoy its protection.  The Constitution does not protect all people in all places.  *Reid v. Covert*, 354 U.S. 1, 74, 77 S. Ct. 1222, 1260 (1957) (Harlan, J., concurring) ("[T]here are provisions in the Constitution which do not necessarily apply in all circumstances in every foreign place.").  This en banc court recognizes that the Supreme Court has foreclosed extraterritorial application of the Fourth Amendment to aliens where the violation occurs on foreign soil and the alien plaintiff lacks any prior substantial connection to the United States.  *Verdugo-Urquidez*, 494 U.S. at 261, 110 S. Ct. at 1059.

Chief Justice Rehnquist wrote in *Verdugo-Urquidez* that the Fourth Amendment's text refers to the right of "the people" to be free from unreasonable searches.  "The people," in turn, "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265, 110 S. Ct. at 1061.  Turning to the Amendment's history, the Court explained that "[t]he driving force behind the adoption of the Amendment . . . was widespread hostility among the former colonists to the issuance of writs of assistance[.]" *Id.* at 266, 110 S. Ct. at 1061.  The Amendment's purpose, "was to protect the people of the United States against arbitrary action by their own Government[.]" *Id.*  In other words, the Fourth Amendment "restrict[s] searches and seizures which might be conducted by the United States in domestic matters." *Id.*  Contemporary historical understanding, the Court continued, confirmed this reading. *Id.* at 267, 110 S. Ct. at 1061-62.  As a result, the Court held, "aliens receive constitutional protections when they have come within the territory of the

11

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

United States and developed substantial connections with this country." *Id.* at 271, 110 S. Ct. at 1064.

Despite this seemingly clear pronouncement, critics, including the plaintiffs, claim that the substantial connections test is not—and never was— the law. Because Justice Kennedy concurred and his opinion allegedly differs from the purported majority, the skeptics argue, only four justices concurred in Chief Justice Rehnquist's opinion and it is nonbinding. Even if that were not the case, the skeptics continue, *Verdugo-Urquidez*'s substantial connections test was replaced by the majority opinion in *Boumediene*. This court disagrees.

Foremost, Justice Kennedy joined the majority in full, not just in judgment. Supreme Court justices know the difference between the types of joinder. Justice Kennedy began his concurrence by stating: "Although some explanation of my views is appropriate given the difficulties of this case, *I do not believe they depart in fundamental respects from the opinion of the Court, which I join.*" *Verdugo-Urquidez*, 494 U.S. at 275, 110 S. Ct. at 1066 (Kennedy, J., concurring) (emphasis added). If we take Justice Kennedy at his word—as we must—he undoubtedly joined the majority opinion, and the substantial connections test controls.

In any event, the substance of his concurrence does not undermine the substantial connections test—his opinion reinforces it. Concededly, Justice Kennedy did not rely on the Fourth Amendment's reference to "the people"; in his view, "[t]he force of the Constitution is not confined because it was brought into being by certain persons who gave their immediate assent to its terms."[4]

---

[4] This statement has led at least one court to refer to Justice Rehnquist's *reasoning*, specifically his reliance on the Fourth Amendment's text, as only adopted by a plurality. *See Lamont v. Woods*, 948 F.2d 825, 835 (2d Cir. 1991) (explaining that "[t]o a plurality of the Court, the use of the phrase 'the people' suggested that the Framers of the Constitution

*Id.* at 276, 110 S. Ct. at 1067. Instead, the Constitution's application abroad "depend[s] . . . on general principles of interpretation, not on an inquiry as to who formed the Constitution or a construction that some rights are mentioned as being those of 'the people.' " *Id.*, 110 S. Ct. at 1067. Applying such general interpretive principles, Justice Kennedy noted the Court's historic reliance on the distinction between citizens and aliens in determining the Constitution's reach. *Id.* at 275, 110 S. Ct. at 1066. "The distinction between citizens and aliens," he explained, "follows from the undoubted proposition that the Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory." *Id.*, 110 S. Ct. at 1066. This traditional distinction, Justice Kennedy noted, runs through the Court's cases. *Id.*, 110 S. Ct. at 1066.

For Justice Kennedy, the practical consequences of applying the Fourth Amendment extraterritorially also supports the Court's test. "The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment . . . should not apply [abroad]." *Verdugo-Urquidez*, 494 U.S. at 278, 110 S. Ct. at 1068 (Kennedy, J., concurring). "For this reason, in addition to the other persuasive justifications stated by the Court," Justice Kennedy "agree[d] that no violation of the Fourth Amendment [ ] occurred[.]"

---

intended the amendment to apply only to those persons who were part of or substantially connected to the national community"). But it does not throw Chief Justice Rehnquist's *holding*, that only aliens with a substantial connection to the United States have constitutional rights, into doubt. *See Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 996 (9th Cir. 2012).

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

*Id.*, 110 S. Ct. at 1068.  Justice Kennedy's concurrence reinforces rather than undermines Chief Justice Rehnquist's majority opinion.[5]

### III.    The Non-Extraterritoriality of the Fifth Amendment[6]

After agreeing that *Verdugo-Urquidez* forecloses the plaintiffs' Fourth Amendment claim, this court should have been quick to conclude that their alternate Fifth Amendment claim is equally thwarted by *Johnson v. Eisentrager*.  339 U.S. 763, 70 S. Ct. 936 (1950).  The Supreme Court held in *Johnson*, and has reiterated since then, that as a general matter aliens outside the sovereign territory of the United States are not entitled to Fifth Amendment rights.  *Id.* at 782-85, 70 S. Ct. at 945-47.  *Verdugo-Urquidez* described *Johnson* as unambiguously "reject[ing] the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the

---

[5] Since the Court decided *Verdugo-Urquidez*, courts have applied the substantial connections test.  *See Ibrahim*, 669 F.3d at 997 (applying the significant voluntary connection test to an alien's First and Fifth Amendment claims); *Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009) (explaining that the "[D]ue [P]rocess [C]lause does not apply to aliens without property or presence in the sovereign territory of the United States"), *vacated and remanded*, 559 U.S. 131, 130 S. Ct. 1235 (2010), *reinstated in relevant part*, 605 F.3d 1046 (D.C. Cir. 2010); *United States v. Emmanuel*, 565 F.3d 1324, 1331 (11th Cir. 2009) (holding that the Fourth Amendment does not protect a Bahamian citizen with no substantial connections to the U.S.); *Atamirzayeva v. United States*, 524 F.3d 1320, 1329 (Fed. Cir. 2008) (holding that a foreign citizen with no substantial connections to the U.S. has no claim under the Fifth Amendment's Takings Clause); *United States v. Barona*, 56 F.3d 1087, 1093-94 (9th Cir. 1995) (explaining that "with regard to foreign searches involving aliens with 'no voluntary connection' to the United States, [ ] the Fourth Amendment is simply inapplicable").

[6] The plaintiffs argue without conviction that because Agent Mesa's conduct occurred solely on U.S. soil, this case does not require extraterritorial application of the Constitution.  In both *Verdugo-Urquidez* and *Sosa*, however, the Supreme Court treated the cases as involving extraterritorial violations despite the presence of actions on American soil that preceded the foreign incidents.  This case is no different.  Indeed, the hoary principle of *lex loci delicti* ("law of the place of injury") historically required the application of the law at the place where the last act causing injury (here, the bullet hitting Hernandez) occurred.  *Cf. Sosa*, 542 U.S. at 708-711, 124 S. Ct. at 2752-2754 (interpreting the Federal Tort Claims Act foreign country exception, 28 U.S.C. § 2680(k), to apply where the injury occurred, not where the last act or omission causing injury occurred).

14

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

United States." *Verdugo-Urquidez*, 494 U.S. at 269, 110 S. Ct. at 1063. *Johnson* was similarly described by the Court in *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S. Ct. 2491, 2500 (2001); *see also Castro v. Cabrera*, 742 F.3d 595, 599 n.5 (5th Cir. 2014) (noting that *Johnson* "reject[ed] extraterritorial application of the Fifth Amendment"). This court is not at liberty to "underrule" Supreme Court decisions when the Court has explicitly failed to overrule its own precedents. *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917, 1921-22 (1989). Consequently, the plaintiffs' substantive due process claim is barred by these precedents.

The plaintiffs' implicit position is that *Johnson* was *de facto* overruled by *Boumediene*, 553 U.S. 723, 128 S. Ct. 2229, and *Johnson*'s refusal to apply the Fifth Amendment extraterritorially was replaced by the three-part test inaugurated in *Boumediene*.[7] As I have noted, this court squarely rejects the plaintiffs' argument in regard to the Fourth Amendment. The diffidence with regard to the Fifth Amendment must stem from *Boumediene*'s discussion and theoretical reframing of *Johnson*. *See Boumediene*, 553 U.S. at 766, 128 S. Ct. at 2259. *Boumediene* and *Johnson* admittedly share the factual similarity that enemy aliens incarcerated outside the continental United States were petitioning for habeas corpus review of their incarceration by the United States military. From the standpoint of this inferior court, however, reading tea leaves as to how far the Supreme Court plans ultimately to press extraterritorial application of constitutional provisions is a useless exercise. Until the Court overrules *Johnson*, we remain bound by its holding.

---

[7] That test requires courts to examine "(1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ." *Boumediene*, 553 U.S. at 766, 128 S. Ct. at 2259.

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

To be more precise, *Boumediene* was expressly limited to holding that the Suspension Clause, art. I, § 9, cl. 2 of the Constitution, applies to enemy combatants detained in the Guantanamo Bay, Cuba, military facility. *Boumediene*, 553 U.S. at 771, 128 S. Ct. at 2262. The significance of both the "Great Writ" and the United States' plenary control at Guantanamo was equally critical to the Court's holding. The Court stated: "In the system conceived by the Framers the writ had a centrality that must inform proper interpretation of the Suspension Clause," and cited *Blackstone*, who called it the "bulwark of our liberties." *Id.* at 739, 742, 128 S. Ct. at 2244, 2246 (citing 1 W. Blackstone, Commentaries *137). The Court also held that the concerns regarding separation of powers "have particular bearing upon the Suspension Clause question in the cases now before us, for the writ of habeas corpus is itself an indispensable mechanism for monitoring the separation of powers." *Id.* at 765, 128 S. Ct. at 2259. With respect to the unique circumstances at Guantanamo, the Court variously stated that the Government has "total military and civil control"; "complete jurisdiction and control"; "*de facto* sovereignty"; and had "complete and uninterrupted control of the bay for over 100 years." *Id.* at 747, 755, & 764, 128 S. Ct. at 2248, 2253, & 2258.

*Boumediene* fashioned a test that it claimed to derive from past decisions that considered the extraterritorial reach of other constitutional provisions. *See Boumediene*, 553 U.S. at 760, 128 S. Ct. at 2256 (citing *In re Ross*, 140 U.S. 453, 11 S. Ct. 897 (1891) (Fifth and Sixth Amendments)); *id.* at 762, 128 S. Ct. at 2257 (citing *Johnson*, 339 U.S. 763, 70 S. Ct. 936 (Fifth Amendment)); *id.*, 128 S. Ct. at 2257 (citing *Verdugo-Urquidez*, 494 U.S. at 277, 110 S. Ct. at 1067 (Fourth Amendment)). The Court concluded that *de jure* sovereignty does not alone determine the extraterritorial reach of the Constitution; instead, "questions of extraterritoriality turn on objective factors and practical concerns, not formalism." *Id.* at 764, 128 S. Ct. at 2258. But the Court

16

ultimately held its three-factor test relevant "in determining the reach *of the Suspension Clause . . . ."  Id.* at 766, 128 S. Ct. at 2259 (emphasis added). Moreover, the Court disclaimed any intention to overrule the holdings of *Johnson* or *Verdugo-Urquidez. Id.* at 795, 128 S. Ct. at 2275.

Given that *Boumediene* applied its three-factor test to a different constitutional provision than those with which we are confronted, and that it did not overrule the controlling precedents, it bears repeating:  this court may not step ahead of the Supreme Court to hold *Johnson* (or *Verdugo-Urquidez*) no longer binding.  Thus, this is not a case where no "clearly established law" articulates the plaintiffs' rights to exterritorial application of the Fifth Amendment.  Following *Boumediene*, there is no law at all supporting their position, and thus no Fifth Amendment claim exists.[8]

Significantly, the plaintiffs cited no case holding that their Fifth Amendment extraterritoriality claim has any viability.  To the contrary, in light of the Court's repeated references to the Suspension Clause, we must assume that the Court "explicitly confined its holding 'only' to the extraterritorial reach of the Suspension Clause and disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause." *Ali v. Rumsfeld*, 649 F.3d 762, 771 (D.C. Cir. 2011) (internal citations and quotation marks omitted); *see also Al Bahlul v. United States*, 767 F.3d 1, 33 (D.C. Cir. 2014)

---

[8] I need not speculate on whether *Boumediene*'s rationale will ultimately be extended to determine the extraterritorial reach of other constitutional provisions.  It is important to note, however, that even a defender of this prediction acknowledges the need for refinements of the three-factor functional test if *Boumediene* is brought to bear on other constitutional provisions.  *See* Gerald L. Neuman, *The Extraterritorial Constitution After Boumediene v. Bush*, 82 S. CAL. L. REV. 259, 287 (2009) ("This nonexclusive [three-factor test] was tailored to the Suspension Clause and its case law, and would presumably need modification to address other rights.").

17

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

(en banc) (Henderson, J., concurring) ("Whether *Boumediene* in fact portends a sea change in the extraterritorial application of the Constitution writ large, we are bound to take the Supreme Court at its word when it limits its holding to the Suspension Clause." (internal citation omitted))[9]; *Igartúa v. United States*, 626 F.3d 592, 600 (1st Cir. 2010) ("[T]he *Boumediene* court was concerned only with the Suspension Clause . . . not with . . . any other constitutional text.").

For all these reasons, the plaintiffs plainly have no cognizable constitutional claim against Agent Mesa.

## IV. The Alien Tort Statute Does not Waive U.S. Sovereign Immunity

The plaintiffs seek damages *from the United States* under the ATS, urging as follows: Congress enacted the ATS to allow aliens to sue for violating "the law of nations." 28 U.S.C. § 1350. The tort alleged in this case is "extrajudicial killing," an alleged violation of *jus cogens* norms of customary international law.[10] Customary international law asserts that by their nature, *jus cogens* violations apply even without a nation's consent (consent being the

---

[9] *Al Bahlul*'s holding is not to the contrary. In *Al Bahlul*, the Government conceded that the Ex Post Facto Clause applies to aliens detained at Guantanamo Bay. 767 F.3d at 18. And the en banc court "assume[d] without deciding that the *Ex Post Facto* Clause applies at Guantanamo." *Id.* (italics in original).

[10] According to the Restatement (Third) of Foreign Relations Law § 702 and cmt. n (1987), a state violates a *jus* cogens norm if it as a matter of policy:

> [P]ractices, encourages, or condones (a) genocide, (b) slavery or slave trade, (c) the murder or causing the disappearance of individuals, (d) torture or other cruel, inhuman, or degrading treatment or punishment, (e) prolonged arbitrary detention, (f) systematic racial discrimination, [or] (g) a consistent pattern of gross violations of internationally recognized human rights.

18

ordinary prerequisite to rules of customary international law).[11]   In cases involving foreign officials sued for *jus cogens* violations of human rights, courts have held that individual immunity from suit does not exist.  Finally, although the ATS has been held not to waive foreign states' sovereign immunity, *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 109 S. Ct. 683 (1989), the plaintiffs assert that "Congress has not enacted a similar comprehensive scheme regulating U.S. sovereign immunity for international law violations prosecuted in our own courts."  And by this inaction, Congress has signaled that the United States is amenable to ATS suits.

The concurring opinion here finds this reasoning "logical," concludes that it has some force," and posits:

> [I]f there is a category of torts (violations of the law of nations, for example) that change the ordinary rules of sovereign immunity because these acts cannot be authorized by the sovereign, then a country either would lack any such immunity to waive or would not be permitted to substitute for one of its officers.

*Post* at 44, 46, & 42 (Haynes, J., concurring).  The concurrence asserts that this question has not been addressed by the panel opinion or the en banc compromise opinion that reinstates the panel decision.  The concurrence believes this issue was left "unaddressed" in *Sosa* and suggests the Supreme Court take it up.  *Post* at 42, 46.

With due respect, the plaintiffs' theory has yet to be adopted by any circuit court of appeals and has been repeatedly rejected, and that is because it has no valid foundation in the American constitutional structure, in the ATS,

---

[11]   Vienna Conv. on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679 (*jus cogens* norm is "peremptory norm" of international law, "a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character"); *see also* Restatement (Third) of Foreign Relations Law § 102 and cmt. k (1987).

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

or in Supreme Court precedent. To effectuate their theory would create a breathtaking expansion of federal court authority, would abrogate federal sovereign immunity contrary to clearly established law, and would have severely adverse consequences for the conduct of American foreign affairs.

Taking the Supreme Court decisions first, *Sosa* did not consider U.S. sovereign immunity for ATS violations because the federal government was sued only under the Federal Tort Claims Act. 542 U.S. at 698, 124 S. Ct. at 2747. The ATS claim was alleged only against Sosa, a Mexican national, individually. *Id*. at 698, 124 S. Ct. at 2747. No issue of American sovereign immunity from ATS claims was presented for the Court to decide or even comment on. The overarching theme of *Sosa*, moreover, is one of caution, not expansion of federal court authority. Inferences that *Sosa* might leave open an implied waiver of sovereign immunity are implausible. First, the Court in *Sosa* held unanimously that the ATS is a strictly jurisdictional statute. *Sosa*, 542 U.S. at 714, 124 S. Ct. at 2755. It does not provide a substantive basis for aliens' general assertions of customary international law violations. Purely jurisdictional statutes do not waive sovereign immunity. *United States v. Testan*, 424 U.S. 392, 398, 96 S. Ct. 948, 953 (1976). Second, *Sosa* rejected the view that the ATS "ought to cover all [customary international law] claims, so long as they also qualify as torts" and instead gave "domestic legal force to an extremely limited subset of [customary international law] claims . . . based on its reading of the specific intent of Congress." *Al-Bihani v. Obama*, 619 F.3d 1, 19 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of rehearing en banc) (quoting Ernest A. Young, *Sosa and the Retail Incorporation of International Law*, 120 HARV. L. REV. F. 28, 29 (2007)). According to *Sosa*, the only claims authorized by the ATS for violations of international law norms are those with no "less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." 542 U.S. at 732,

124 S. Ct. at 2765.    In addition, "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, invariably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts."  542 U.S. at 732-33, 124 S. Ct. at 2766 (footnotes omitted).  The Court went on to deny Alvarez's claim for arbitrary arrest and detention in violation of an international treaty and the Universal Declaration of Human Rights.  542 U.S. at 738, 124 S. Ct. at 2769.

What does this cautionary opinion imply about federal sovereign immunity?  As earlier noted, the Court decided in *Amerada Hess* that the FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in federal court," 488 U.S. at 439, 109 S. Ct. at 690.  The Court flatly rejected the argument that Congress, by failing explicitly to repeal the ATS when it amended the FSIA, had intended for federal courts to "continue to exercise jurisdiction over foreign states in suits alleging violations of international law outside the confines of the FSIA."  488 U.S. at 435, 109 S. Ct. at 689.  That rejection would have been even more emphatic had the court considered whether the ATS waives the United States' sovereign immunity because, as then-Judge Scalia pointed out, foreign sovereign immunity rests only on international comity, while domestic sovereign immunity originates in the constitutional separation of powers.    *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 n.5 (D.C. Cir. 1985).  The plaintiffs here err twice in asserting the abrogation of federal sovereign immunity under the ATS.

First, my colleagues' argument in the negative—that Congress silently reserved the defense of sovereign immunity against potential violations of international law in U.S. courts, has it backward about the ATS, just as the Court held with respect to foreign sovereign immunity in *Amerada Hess*. Federal sovereign immunity is the overarching principle, which must be

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

explicitly waived by the federal government.[12]  "[T]he United States cannot be sued at all without the consent of Congress." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287, 103 S. Ct. 1811, 1819 (1983).  To consent, Congress must unequivocally waive sovereign immunity in statutory text; waiver will not be implied.  *Lane v. Pena*, 518 U.S. 187, 192, 116 S. Ct. 2092, 2096 (1996).  As Judge Scalia held in *Sanchez-Espinoza*, "[i]t would make a mockery of the doctrine of sovereign immunity if federal courts were authorized to sanction or enjoin, by judgments nominally against present or former Executive officers, actions that are, *concededly and as a jurisdictional necessity*, official actions of the United States."  770 F.2d at 207 (emphasis in original).[13]

Second, they mistakenly confuse cases deriving from foreign official immunity, an immunity based on officials' status or conduct (and separate from the sovereign state's own immunity), with the constitutional principle involved in U.S. sovereign immunity.  *See, e.g.*, *Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012).  No case has ever held the United States government has forfeited its sovereign immunity from suit because of any alleged violation of international law, whether *jus cogens* or otherwise.  Nevertheless, they would expose the United States, alone among the nations of the world, to liability in

---

[12]  This is exactly the point my colleagues fail to acknowledge.  As they explain, because "Congress does not appear to have acted in the same way [as it did with the FSIA] to define federal court jurisdiction over suits against the United States by foreign nationals under the ATS," the ATS, as interpreted in *Sosa*, can deny the government its immunity. *Post* at 41 n.4.  But the United States' immunity from suit in federal courts is the rule, subject to explicit exceptions.  Therefore, Congress need not do *anything* to preserve its sovereign immunity.

[13]  He qualified this statement by noting that, "These consequences are tolerated when the officer's action is unauthorized because contrary to statutory or constitutional prescription, but we think that exception can have no application when the basis for jurisdiction [under the ATS] requires action authorized by the sovereign as opposed to private wrongdoing."  *Id.*  (citation and footnote omitted).

federal courts under the ATS without the protection of sovereign immunity. Contrary to the plaintiffs' assertions, the Supreme Court's circumspect readings of the ATS in *Sosa* and *Kiobel* (rejecting ATS's extraterritorial application) offer no basis for the novel proposition that the ATS impliedly forfeits federal sovereign immunity.

Neither the plaintiffs nor the concurring opinion mentions that every other circuit court asked to hold the United States potentially liable under the ATS has declined the invitation. For example, in *Tobar v. United States*, 639 F.3d 1191 (9th Cir. 2011), Ecuadorian nationals sued the United States under the ATS after the Coast Guard stopped, boarded, and detained their ship. The Ninth Circuit considered a number of statutes that might contain waivers of sovereign immunity, including the ATS. With respect to the ATS, the court held "[t]he Alien Tort Statute has been interpreted as a jurisdiction statute only—it has not been held to imply any waiver of sovereign immunity." *Id.* at 1196 (internal citations and quotation marks omitted). This determination is particularly notable because it post-dates the Supreme Court's decision in *Sosa*.

The Fourth Circuit reached the same conclusion in *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992). The plaintiffs there asserted ATS claims against the United States government for property damage that occurred during the U.S. invasion of Panama. Once again, the government asserted its sovereign immunity, and the court agreed, holding that "any party asserting jurisdiction under the Alien Tort Statute must establish, independent of that statute, that the United States has consented to suit." *Id.*

So too for the D.C. Circuit. In *Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985), Nicaraguan citizens sued the United States for injuries incurred at the hands of the Contras. *Id.* at 205. The federal government

asserted its sovereign immunity. Then-Judge Scalia held, in no uncertain terms, that "[t]he Alien Tort Statute itself is not a waiver of sovereign immunity." *Id.* at 207; *see also Canadian Transp. Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980).

That these plaintiffs assert a violation of a *jus cogens* norm does not—and should not—change the outcome of the sovereign immunity analysis. The plaintiffs argue that *jus cogens* norms occupy such a high place in international law that their violation abrogates sovereign immunity. Other circuits to address such an argument have rejected it. In *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009), the Second Circuit held that *jus cogens* norms cannot abrogate sovereign immunity when Congress has explicitly granted such immunity in the FSIA. It then broadly asserted that "[a] claim premised on the violation of *jus cogens* does not withstand foreign sovereign immunity." *Id.* at 15; s*ee also Princz*, 26 F.3d at 1174; *Siderman*, 965 F.2d at 718-719; S*mith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 242-44 (2d Cir. 1996). The same principle should apply to the constitutionally-footed doctrine of federal sovereign immunity. Given the unanimous decisions of the other circuits, there is no justification for a federal court's unilateral abrogation of our government's sovereign immunity under the ATS.

Returning once more to *Sosa*, it becomes clear that the Court, as it rejected Alvarez's broad claim for a violation of "the law of nations," fully realized the potentially untoward consequences of empowering lower courts to adopt a federal common law of international law torts. Not only did the Court limit the scope of such actions, but it also explained the difficulties that would ensue had it adopted Alvarez's facially appealing claim:

> Alvarez cites little authority that a rule so broad has the status of a binding customary norm today. He certainly cites nothing to justify the federal courts in taking his broad rule as the predicate for a federal lawsuit, for its implications would be

breathtaking. His rule would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place, and would create a cause of action for any seizure of an alien in violation of the Fourth Amendment, supplanting the actions under Rev. Stat. § 1979, 42 U.S.C. § 1983, and *Bivens* . . . , that now provide damages remedies for such violations. It would create an action in federal court for arrests by state officers who simply exceed their authority; and for the violation of any limit that the law of any country might place on the authority of its own officers to arrest. And all of this assumes that Alvarez could establish that Sosa was acting on behalf of a government when he made the arrest, for otherwise he would need a rule broader still.

542 U.S. at 736-37, 124 S. Ct. at 2768 (footnote omitted).

Whatever may be said for the broad principle Alvarez advances, in the present, imperfect world, it expresses an aspiration that exceeds any binding customary rule having the specificity we require.

542 U.S. at 738, 124 S. Ct. at 2769 (footnote omitted).

The parallels between these concerns and those attending a claim for "extrajudicial killing" are obvious. The plaintiffs' advocacy here of a broad rule clearly has implications for both domestic law enforcement and for the use of American lethal force in foreign confrontations. Such alleged violations of *jus cogens* could transform every use of deadly force by a federal officer against an alien into a litigable violation of a peremptory norm of international law, supplanting *Bivens* actions. These claims could also be asserted by aliens against state or local law enforcement officers, supplanting § 1983 actions. Finally, this alleged cause of action could be asserted directly against the United States, which contravenes federal sovereign immunity and is at odds with the FSIA immunity from suit every foreign nation enjoys in U.S. courts.

The existence of foreign sovereign immunity does not, however, eliminate the international complications of opening American courts to broad

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

and vague claims under the ATS.  As in *Sosa*, the plaintiffs' proffered rule "would support a cause of action in federal court for any [alleged extrajudicial killing], anywhere in the world."  542 U.S. at 736, 124 S. Ct. at 2768.  Although certain *jus cogens* prohibitions, *e.g.* state-sponsored slavery or genocide, may be self-evidently within the scope of the Supreme Court's reasoning in *Sosa*, "[a]ny credible invocation of a principle against [extrajudicial killing] that the civilized world accepts as binding customary international law requires a factual basis beyond" mere conclusional pleadings.  *Sosa*, 542 U.S. at 737, 124 S. Ct. at 2769.  That a multiplicity of claims could aggravate relations with foreign nations and thwart the Executive and Legislative branches' discretion in conducting foreign affairs seems obvious and constitutes additional reasons, acknowledged in *Sosa*, for extreme caution in recognizing claims for breach of "the law of nations" actionable via the ATS.  542 U.S. at 727, 124 S. Ct. at 2763.

In sum, the plaintiffs' ATS claim against the United States is without foundation, and the concurring opinion should not be read as improvidently providing them support.

## Conclusion

### A "Lawless" U.S. Border?

One final point is necessary in response to the plaintiffs' assertion that enforcement of United States borders will become "lawless" if aliens in the position of Hernandez lose access to American civil tort recovery.  This court must, of course, assume, based only on the pleadings, that Hernandez was the victim of an unprovoked shooting.  The plaintiffs' assertion of official, or officially condoned lawlessness is, however, inaccurate.  This tragedy neither should, nor has, escaped review.  Numerous federal agencies, including the FBI, the Department of Homeland Security's Office of the Inspector General, the Justice Department's Civil Rights Division, and the United States Attorney's Office, investigated this incident and declined to indict Agent Mesa

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

or grant extradition to Mexico under 18 U.S.C. § 3184.  There were other possible avenues for evaluation of Agent Mesa's conduct.  Plaintiffs could have sought federal court review of the Attorney General's scope of employment certification under the Westfall Act.  *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420, 115 S. Ct. 2227, 2229 (1995); *see also Osborn v. Haley*, 549 U.S. 225, 229-30, 127 S. Ct. 881, 887-88 (2007).  Further, state systems may superintend excesses of federal executive authority. *See* 28 U.S.C. § 2679(d)(3).  A judicially implied tort remedy under *Bivens* for constitutional violations or the Alien Tort Statute is not and was not the plaintiffs' only source of review for this tragedy.

I respectfully concur in the en banc opinion.

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

JAMES L. DENNIS, Circuit Judge, concurring in part and concurring in the judgment:

I join the en banc court's opinion in its entirety except as to its reason for denying Appellants' Fourth Amendment claim, with which I agree in result. I also join the concurring opinion of Judge Prado, except to the extent that it adopts the en banc court's reason for denying this claim. In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court apparently ruled that the phrase "the people" in the Fourth Amendment "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this community to be considered part of that community." *Id.* at 265. I am inclined to agree, however, with those who have suggested that the *Verdugo-Urquidez* view cannot be squared with the Court's later holding in *Boumediene v. Bush*, 553 U.S. 723 (2008), that "questions of extraterritoriality turn on objective factors, and practical concerns, not formalism." *Id.* at 764; *see* WAYNE R. LAFAVE ET AL., 2 CRIM. PROC. § 3.1(i) n.237.1 (3d ed. 2014) (citing Gerald L. Neuman, *The Extraterritorial Constitution After* Boumediene v. Bush, 82 S. CAL. L. REV. 259, 259, 272 (2008); Ellen S. Podgor, *Welcome to the Other Side of the Railroad Tracks: A Meaningless Exclusionary Rule*, 16 SW. J. INT'L L. 299, 310 (2010)); Baher Azmy, *Executive Detention,* Boumediene*, and the New Common Law of Habeas*, 95 IOWA L. REV. 445, 465 (2010); Christina Duffy Burnett, *A Convenient Constitution? Extraterritoriality After* Boumediene, 109 COLUM. L. REV. 973, 1044 (2009); Timothy Zick, *Territoriality and the First Amendment: Free Speech at—and Beyond—Our Borders*, 85 NOTRE DAME L. REV. 1543, 1614 (2010).

The Mexican government has indicated that our adjudication of the Appellants' claims, whether under the Fourth or Fifth Amendment, in this

particular case would not cause any friction with its sovereign interests. However, it appears that our judicial entanglement with extraterritorial Fourth Amendment excessive-force claims would be likely to involve impracticable and anomalous factors. For these reasons, I agree with the opinion of the court in declining to apply the Fourth Amendment to adjudicate the Appellants' claims but I do so out of concern for pragmatic and political questions rather than on a formal classification of the litigants involved.

EDWARD C. PRADO, Circuit Judge, concurring:

I agree with the en banc court's holding that the constitutional rights asserted by 15-year-old Sergio Hernández and his family were not clearly established in 2010, when Agent Mesa fired his fatal shots across the international border. However, I am compelled to write separately in response to Judge Jones's concurring opinion, which, in my view, sets forth an oversimplified and flawed analysis of the Fifth Amendment and the Supreme Court's extraterritoriality precedents. In her concurrence, Judge Jones offers an interpretation of the Fifth Amendment implications of *Graham v. Connor*, 490 U.S. 386 (1989), that is contrary to Supreme Court precedent and is certain to sow confusion in our circuit. Further, the concurrence rests on a reading of the Court's pivotal extraterritoriality rulings in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), *United States v. Verdugo–Urquidez*, 494 U.S. 259 (1990), and *Boumediene v. Bush*, 553 U.S. 723 (2008), that sacrifices nuance for an unwarranted sense of certainty.

The facts in this case—though novel—are recurring, and similar lawsuits have begun percolating in the federal courts along the border.[1] Ultimately, it will be up to the Supreme Court to decide whether its broad statements in *Boumediene* apply to our border with Mexico and to provide clarity to law enforcement, civilians, and the federal courts tasked with interpreting the Court's seminal opinions on the extraterritorial reach of constitutional rights. Because the law is currently unclear, I join the en banc court's opinion in full and write separately only to respond to Judge Jones's concurring opinion.

---

[1] *See, e.g.*, *Rodriguez v. Unknown Parties*, No. 4:14-cv-02251 (D. Ariz. filed July 29, 2014).

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

## I.    The Applicability of the Fifth Amendment

The notion that the Fourth Amendment provides the exclusive means of relief for Hernández is rooted in a strained and incorrect reading of *Graham v. Connor*. The Court in *Graham* held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395. The Court explained that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.*

Judge Jones's concurrence rightly points to these portions of the Court's opinion, but it elides key limiting phrases in each: "free citizen" and "explicit textual source." If, as the Court held in *Verdugo–Urquidez*, 494 U.S. at 274–75, the Fourth Amendment does not shield aliens located abroad (*viz.* non-"free citizens"), then it cannot provide "an explicit textual source of constitutional protection" to persons in Hernández's position, and *Graham*'s directive to apply the Fourth Amendment to *covered* excessive-force claims is simply inapt.

Indeed, as the Court explained in *United States v. Lanier*, 520 U.S. 259 (1997), "*Graham* . . . does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, *Graham* simply requires that *if a constitutional claim is covered* by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Id.* at 272 n.7 (emphasis added). Subsequent cases have affirmed this view. *See Cnty. of Sacramento v. Lewis*,

31

523 U.S. 833, 843 (1998) ("Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is 'covered by' the Fourth Amendment. It is not."); *Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir. 1998) ("[A] plaintiff whose claim is not susceptible to proper analysis with reference to a specific constitutional right may still state a claim under § 1983 for a violation of his or her Fourteenth Amendment substantive due process right, and have the claim judged by the constitutional standard which governs that right.").[2]

Hernández, a noncitizen, was fatally shot in Mexico by a U.S. government agent standing on U.S. soil. Accepting Hernández's allegations as true, as we must on a motion to dismiss, Agent Mesa made no effort to

---

[2] Apparently troubled by the implication that the Court in *Graham* excluded the class of claims at issue here from the presumptive coverage of the Fourth Amendment, Judge Jones's concurrence imputes a restrictive meaning to the Court's phrase "free citizens." According to the concurrence, the Court could not have intended to permit non-citizens to assert claims for excessive force under the Fourteenth Amendment while limiting citizens to the Fourth Amendment. But this misses the point. Even if, as the concurrence suggests, the Court used this term in *Graham*—a case centering on the use of excessive force during an investigatory stop of a citizen, 490 U.S. at 388–89—to distinguish between the constitutional protections afforded to civilians, pretrial detainees, and incarcerated individuals, this says nothing about whether a claim that falls outside of these set boundaries is "covered by" the Fourth Amendment. Where, as here, a *noncitizen* alleges excessive force *abroad*, and there is no indication that the show of authority was directed at *apprehension*, it cannot be that the claim arises under the Fourth Amendment or not at all.

The cases the concurrence cites are not to the contrary. *Cf. Lewis*, 523 U.S. at 843–44 (holding that the passenger of a vehicle being pursued by police was not "seized" during a fatal collision and therefore could assert a substantive due process claim under the Fourteenth Amendment); *Albright v. Oliver*, 510 U.S. 266, 273–74 (1994) (declining to recognize a substantive due process right to be free from criminal prosecution without probable cause because the Fourth Amendment was drafted to address pretrial deprivations of liberty); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–99 (1989) (determining that the fatal use of a roadblock to terminate a suspect's flight constituted a seizure and observing that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*"); *Tennessee v. Garner*, 471 U.S. 1, 3, 7 (1985) (analyzing the apprehension of a fleeing suspect through the use of deadly force as a seizure).

apprehend Hernández—he detained one of Hernández's companions, then fired his service weapon into Mexico, where Hernández hid behind the pillar of a bridge, and he ultimately left Hernández's body where it lay. Under *Verdugo–Urquidez* and *Lewis*, the Fourth Amendment does not "cover" this claim of excessive force. I would therefore hold that Hernández may invoke the Fifth Amendment's prohibition on constitutionally arbitrary official conduct.

## II.     The Extraterritoriality of the Fifth Amendment

Judge Jones's concurrence paints our extraterritoriality case law in broad strokes, with a palette of black and white. The state of the law, as the concurrence views it, permits no gray.[3] According to the concurrence, the Constitution cannot apply extraterritorially to the facts of this case because the Supreme Court has held, generally, that the Fourth and Fifth Amendments do not apply to noncitizens with no significant voluntary connection to the United States. Citing *Eisentrager* and *Verdugo–Urquidez*, the concurrence asserts that the Supreme Court has foreclosed the question before our Court. This uncomplicated view of extraterritoriality fails to exhibit due regard for the Court's watershed opinion in *Boumediene*, which not only authoritatively

---

[3] The absolutism of the concurrence's analytical framework is epitomized by its phrasing of the constitutional issue in this case: "United States constitutional rights do not extend to aliens who (a) lack any connection to the United States and (b) are injured on foreign soil." All nuance is lost, and only one conclusion follows from the question presented. But there is no question that Hernández had *some* connection to the United States, even if not the "significant voluntary connection" required to invoke the protections of the Fourth Amendment under *Verdugo–Urquidez*, 494 U.S. at 271, by virtue of the acts of Agent Mesa that originated in the United States and had their effect in Mexico. Likewise, it is misguided to focus exclusively on Hernández's location within Mexico when the bullets Agent Mesa fired from United States soil found their target. This is not a case involving a drone strike, an act of war on a distant battlefield, or law-enforcement conduct occurring entirely within another nation's territory; it is a fatal shooting by small-arms fire in which the short distance separating those involved was bisected by an international border. These distinct facts cast doubt on the concurrence's simplistic framework and belie its warning that this case implicates "our nation's applications of force abroad."

interpreted these earlier cases but also announced the bedrock standards for determining the extraterritorial reach of *the Constitution*—not just the writ of habeas corpus. Applying these standards, I would hold the Fifth Amendment applicable to the particular facts alleged by Hernández.

In *Boumediene*, the Court provided its clearest and most definitive articulation of the principles governing the application of constitutional provisions abroad. Although the Court was tasked with deciding the narrow question of whether aliens designated enemy combatants and detained at Guantanamo Bay had the constitutional privilege of habeas corpus, Justice Kennedy wrote a lengthy opinion for the Court that grappled with the foundations of extraterritoriality. The Court first discussed its sparse extraterritoriality precedents and found them to undermine "the Government's argument that, at least as applied to noncitizens, *the Constitution* necessarily stops where *de jure* sovereignty ends." *Boumediene*, 553 U.S. at 755 (emphasis added). Rather, the Court read beyond the bare holdings of these cases and concluded that they shared a common thread: "the idea that questions of extraterritoriality turn on objective factors and practical concerns, not formalism." *Id.* at 764.[4] Based on these considerations, the Court identified at

---

[4] Critically, while explaining its reasoning, the Court repeatedly cited Justice Kennedy's concurring opinion in *Verdugo–Urquidez*, in which he advocated a functional analysis of extraterritoriality. *Boumediene*, 553 U.S. at 759–62. In *Verdugo–Urquidez*, the Court held that the Fourth Amendment had no application to DEA agents' warrantless search of a Mexican citizen's residences in Mexico. 494 U.S. at 262, 274–75. Although he agreed with the Court's ultimate conclusion that no Fourth Amendment violation had occurred, Justice Kennedy wrote separately to express his view that the reach of the Constitution is not confined by the identity of the class of persons that ratified the instrument or by the text used to denominate those subject to its protection (e.g., "the people"). *Id.* at 275–76 (Kennedy, J., concurring). Rather, Justice Kennedy urged a functional approach to extraterritoriality—one that he traced as far back as *In re Ross*, 140 U.S. 453 (1891), the *Insular Cases* (e.g., *Downes v. Bidwell*, 182 U.S. 244 (1901), *Hawaii v. Mankichi*, 190 U.S. 197 (1903), *Dorr v. United States*, 195 U.S. 138 (1904), and *Balzac v. Porto Rico*, 258 U.S. 298 (1922)), and *Reid v. Covert*, 354 U.S. 1, 74 (1957) (Harlan, J., concurring). *See id.* at 277–78 ("These [extraterritoriality]

least three factors that were relevant in determining the reach of the Suspension Clause: (1) the citizenship and status of the detainee and the quality of the process underlying this finding; (2) the nature of the sites where the apprehension and detention occurred; and (3) the practical obstacles inherent in determining the detainee's entitlement to the writ. *Id.* at 766. After analyzing these factors, the Court held that the Suspension Clause "has full effect at Guantanamo Bay." *Id.* at 771.

This holding may have been limited to the Suspension Clause, but the Court's reasoning was decidedly not so constricted. Justice Kennedy's opinion drew from the analysis of numerous rights in numerous contexts *other than habeas*, *id.* at 755–64, framing its review of the case law as a survey of the Court's discussions of "*the Constitution's* extraterritorial application," *id.* at 755 (emphasis added). More importantly, when the Court rejected the Government's proffered reading of *Eisentrager*—the case that Judge Jones's concurrence cites as facially foreclosing Hernández's Fifth Amendment claim[5]—it announced in no uncertain terms that "[n]othing in *Eisentrager* says

authorities . . . stand for the proposition that we must interpret constitutional protections in light of the undoubted power of the United States to take actions to assert its legitimate power and authority abroad."); *id.* at 278 (analyzing the extraterritorial reach of the Fourth Amendment by determining whether "[t]he conditions and considerations of this case would make adherence to the [Amendment] . . . impracticable and anomalous").

The significance of this opinion, which evinces Justice Kennedy's dedication to applying a functional approach to extraterritoriality even in a U.S.–Mexico cross-border law-enforcement context, cannot be understated. And it hardly bears repeating here that Justice Kennedy cast the deciding vote in both *Verdugo–Urquidez* and *Boumediene*.

[5] As *Boumediene* recognized, the ruling in *Eisentrager* cannot reasonably be divorced from its idiosyncratic facts: the extension of Fifth Amendment rights and the writ of habeas corpus to alleged members of the German armed forces who were captured in China, convicted of violating the laws of war, and imprisoned in occupied, post-World War II Germany. *See Boumediene*, 553 U.S. at 762–64. If the enemy combatants at Guantanamo Bay were not sufficiently similar to the petitioners in *Eisentrager* to be bound by that case, then Hernández—an unarmed fifteen-year-old boy with the misfortune of standing on the wrong side of an international border—certainly is not.

that *de jure* sovereignty is or has ever been the only relevant consideration in determining the geographic reach of *the Constitution* or of habeas corpus." *Id.* at 764 (emphasis added).[6]

*Boumediene*, and its functionality-focused reading of the Court's previous extraterritoriality decisions, is instructive here. Confronted with a novel extraterritoriality question, we must apply the only appropriate analytical framework the Court has given us: the *Boumediene* factors. Adapted to the present context, three objective factors and practical concerns are relevant to our extraterritoriality determination: (1) the citizenship and status of the claimant, (2) the nature of the location where the constitutional violation occurred, and (3) the practical obstacles inherent in enforcing the claimed right. *Cf. id.* at 766–71.[7] The relevant practical obstacles include the consequences for

---

Furthermore, while Judge Jones's concurrence is quick to emphasize *Boumediene*'s limited holding, it is conspicuously silent as to the significance of *Eisentrager*'s equally narrow ruling. *See Eisentrager*, 339 U.S. at 785 ("We hold that the Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien enemy engaged in the hostile service of a government at war with the United States."). In any event, my point is not that *Boumediene* overruled *Eisentrager*, but that the 2008 case offers us the Court's authoritative reading of the 1950 case—one that eschews a formalistic approach to extraterritoriality. It is *this* interpretation of *Eisentrager*—according to which the case must be understood as consistent with the functional approach endorsed in *Boumediene*—that must guide our analysis.

[6] Even if these statements were mere dicta, we and our fellow circuits have long recognized that the Supreme Court's words carry special weight. *See Schwab v. Crosby*, 451 F.3d 1308, 1325–26 (11th Cir. 2006) (noting that the court has "previously recognized that dicta from the Supreme Court is not something to be lightly cast aside" and citing cases from eleven circuits expressing the deference owed to Supreme Court dicta (citation and internal quotation marks omitted)); *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980) ("We are not bound by dicta, even of our own court. . . . Dicta of the Supreme Court are, of course, another matter.").

[7] Judge Jones's concurrence is of course correct that Professor Neuman, "a defender of th[e] prediction" that *Boumediene* may be extended to other constitutional provisions, has acknowledged "the need for refinements of the three-factor functional test." But that is exactly what the panel majority's original opinion suggested, *see Hernández v. United States*, 757 F.3d 249, 262 (5th Cir. 2014), *vacated in part and reinstated in part on reh'g en banc*, --- F.3d --- (5th Cir. 2015), and what federal courts of appeals are uniquely well-equipped to propound—refinements that are faithful to the Court's opinion, which described the factors

36

U.S. actions abroad, the substantive rules that would govern the claim, and the likelihood that a favorable ruling would lead to friction with another country's government. *See id.*; *Verdugo–Urquidez*, 494 U.S. at 273–74; *id.* at 278 (Kennedy, J., concurring). As the panel majority's original opinion explained, the *Boumediene* factors, coupled with an analysis of the operation, text, and history of the Fifth Amendment, militate in favor of the extraterritorial application of substantive due process protections on these facts. *See Hernández v. United States*, 757 F.3d 249, 259–63, 267–72 (5th Cir. 2014), *vacated in part and reinstated in part on reh'g en banc*, --- F.3d --- (5th Cir. 2015).

In sum, were we to reach the constitutional merits, I would hold, as the vacated panel majority's opinion did, *Hernández*, 757 F.3d at 272, that a noncitizen situated immediately beyond our nation's borders may invoke the protection of the Fifth Amendment against the arbitrary use of lethal small-arms force by a U.S. government official standing on U.S. soil. To hold otherwise would enshrine an unsustainably strict, territorial approach to constitutional rights—one the Supreme Court rejected in *Boumediene*.[8]

---

as non-exclusive and derived them from contexts *in addition to* habeas, *see Boumediene*, 553 U.S. at 766. Moreover, Professor Neuman also reads *Boumediene* as a case with implications beyond habeas corpus, and he has expressed optimism about the expansion of Justice Kennedy's functional approach. *See* Gerald L. Neuman, Essay, *Extraterritoriality and the Interest of the United States in Regulating its Own*, 99 Cornell L. Rev. 1441, 1458, 1470 (2014) (observing that "[a]lthough the holding of *Boumediene* concerned the Suspension Clause, Justice Kennedy described his functional approach as an overall framework derived from precedents involving a variety of constitutional rights," and concluding that "[t]he selective functional approach of *Boumediene v. Bush* should be developed and strengthened to reconcile commitment to constitutional values with the extraterritorial exercise of power").

[8] Disturbingly, such a narrow approach could also create zones of lawlessness where the fortuity of one's location at the time of a gunshot would mark the boundary between liability and impunity. This would result, in turn, in perverse and disturbing incentives for government agents confronted with noncitizen migrants near the border. Because directing lethal force *into* Mexico would violate no constitutional norms, a government agent resorting to deadly force would have every reason to fire his weapon *before* the migrant reaches the U.S. border, or *after* the migrant crosses back into Mexico, to avoid possible civil liability. By contrast, if the agent shoots *while* the migrant is in U.S. territory, then the Constitution is

## III.   Conclusion

Contrary to Judge Jones's concurrence, I believe that the "path of least resistance" presents a prudent course for the en banc court. The depth of our disagreement about the meaning of *Boumediene*, *Verdugo–Urquidez*, and *Eisentrager* is compelling evidence that the law was not clearly established at the time of the tragic events giving rise to this suit. But to affirmatively find no constitutional violation on these facts—which are without parallel in our precedents—requires a troublingly uncomplicated reading of the governing law. Just as *Graham* cannot be understood without *Lanier* and *Lewis*, *Verdugo–Urquidez* and *Eisentrager* cannot be understood without *Boumediene*. Reading these cases in context and with due regard for the novel facts presented here, it is evident that Agent Mesa's fatal cross-border shooting of Sergio Hernández cannot be painted in the simple black and white prevalent in Judge Jones's concurrence. It requires a shade of gray that only a careful engagement with our precedents and the record in this case can produce.

Were we in a position to reach the constitutional merits, I would hold that Agent Mesa's actions violated Hernández's Fifth Amendment right to be free from constitutionally arbitrary government conduct. But until the Supreme Court intervenes to clarify the reach of *Boumediene* and apply Justice Kennedy's functional test to these distinct facts, I remain satisfied that the en banc court has wisely resolved this appeal on clearly-established-law grounds.

---

suddenly—and undesirably—implicated. And it goes without saying that if the scenario were reversed, and Mexican government agents were firing weapons across the border into the United States, unyielding conceptions of territoriality would likely fall by the wayside.

Judge Jones's concurrence disputes the characterization of the border region as "lawless," citing the governmental investigations into Hernández's fatal shooting. But the fact that the United States "declined to indict Agent Mesa or grant extradition to Mexico" speaks not to the promise of accountability but to the practical obstacles associated with the criminal and political processes that exist to regulate official conduct.

No. 11-50792 cons/w Nos. 12-50217 & 12-50301

I respectfully concur in the en banc opinion.

No. 11-50792 Cons/w Nos. 12-50217 & 12-50301

CATHARINA HAYNES, Circuit Judge, joined by SOUTHWICK and HIGGINSON, Circuit Judges, concurring:

I concur in the judgment of the court.[1]  I write separately to address the question of sovereign immunity for the United States in more detail.  As the reinstated panel opinion correctly notes, the Alien Tort Statute ("ATS") is a jurisdictional statute but is not "stillborn."  *Hernandez*, 757 F.3d at 258; *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004).  It provides a forum in United States courts for tort claims by aliens alleging a violation of "the law of nations."[2]  28 U.S.C. § 1350.  The panel majority opinion nonetheless determines that Congress must explicitly waive sovereign immunity to make such torts committed in violation of the "law of nations" actionable against the United States (substituted for one of its officers)—as eloquently described in the special concurrence filed by Judge Jones ("Special Concurrence").[3]  That may be a fair understanding of the current state of the law in this area.  But I

---

[1]  I also concur in the reasoning of the en banc opinion as supplemented herein.

[2]  The parties and panel majority opinion focus on whether sovereign immunity bars an ATS suit, rather than on whether killing an unarmed civilian without any provocation or just cause would violate the types of international norms contemplated by the ATS in the phrase "law of nations."  *See, e.g.*, *Hernandez*, 757 F.3d at 259 (assuming *arguendo* that Plaintiffs averred a violation of the "law of nations" the ATS would recognize by alleging "that the United States violated the international prohibition against 'extrajudicial killings'").  For purposes of this discussion, I will assume that killing a civilian without any provocation or just cause would violate the law of nations, as did the panel majority opinion.  *Id.*

[3]  Because Mesa's conduct occurred in the United States, I do not view *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), cited by the government here, as barring an action under the ATS.  *See id.* at 1669 ("[A]ll the relevant conduct took place outside the United States," such that the ATS did not provide a United States forum for the international tort claimed in that case); *see also id.* at 1670  (Alito, J., concurring) ("[A] putative ATS cause of action will fall within the scope of the presumption against extraterritoriality . . . unless the domestic conduct is sufficient to violate an international law norm that satisfies *Sosa*'s requirements of definiteness and acceptance among civilized nations.").

wish to address some undeveloped implications of what the Supreme Court has so far held, above all in its extended treatment of the ATS in *Sosa*.

As the panel majority opinion notes, *Sosa* holds that federal courts can recognize a "limited" number of international common law torts that fall within the rubric of the ATS. *See Sosa*, 542 U.S. at 712. Left unaddressed is the question of whether any such common law torts would make the sovereign immunity of the United States unavailable. Put another way, if the United States *has* sovereign immunity as the Special Concurrence asserts, then I agree that it must be expressly waived in order for a lawsuit such as this one to be viable. But if there is a category of torts (violations of the law of nations, for example) that change the ordinary rules of sovereign immunity because these acts cannot be authorized by the sovereign, then a country either would lack any such immunity to waive or would not be permitted to substitute for one of its officers.

The Fourth Circuit recently discussed this possibility, noting in the context of foreign official immunity:

> Unlike private acts that do not come within the scope of foreign official immunity, *jus cogens* violations may well be committed under color of law and, in that sense, constitute acts performed in the course of the foreign official's employment by the Sovereign. However, as a matter of international and domestic law, *jus cogens* violations are, by definition, acts that are not officially authorized by the Sovereign.

*Yousuf v. Samantar*, 699 F.3d 763, 775–76 (4th Cir. 2012) (citing *Siderman de Blake v. Republic of Argentina*,[4] 965 F.2d 699, 718 (9th Cir. 1992)

---

[4] At issue in *Siderman* was a foreign state's immunity from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. 965 F.2d at 718–19. The *Siderman* court's discussion of *jus cogens* supports the views expressed in this concurrence; yet, that court ultimately found that it had no jurisdiction over a foreign state (Argentina) because the Supreme Court in *Argentine Republic v. Amerada Hess Shipping Corporation*, 488 U.S. 428, 433 (1989), has interpreted the FSIA as a complete and exclusive scheme

No. 11-50792 Cons/w Nos. 12-50217 & 12-50301

("International law does not recognize an act that violates *jus cogens* as a sovereign act.")).

In turn, *jus cogens* norms are a form of customary international law, a term often used instead of the phrase "law of nations." *See generally* Gwynne L. Skinner, *Roadblocks to Remedies: Recently Developed Barriers to Relief for Aliens Injured by U.S. Officials, Contrary to the Founders' Intent*, 47 U. RICH. L. REV. 555, 565 (2013) ("The ATS gives federal courts jurisdiction over tort claims brought by aliens for violations of the law of nations, a term now seen as synonymous with customary international law."); Ernest A. Young, *Sorting Out the Debate over Customary International Law*, 42 VA. J. INT'L L. 365, 448 (2002) ("[M]ost courts [interpreting the ATS] seem to have limited the scope of actionable customary international law to fundamental or jus cogens norms . . . ."); Justin D. Cummins, *Invigorating Labor: A Human Rights Approach in the United States*, 19 EMORY INT'L L. REV. 1, 5 n.12 (2005) ("Jus cogens 'is now widely accepted . . . as a principle of customary law (albeit of higher status).'" (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS § 102 n.6)); *cf. Siderman*, 965 F.2d at 715 (noting that *jus cogens* differs from customary international law in that "customary international law derives solely from the consent of states, [while] the fundamental and universal norms constituting *jus cogens* [derive from customary laws considered binding on all

governing foreign state immunity in U.S. courts. *See Siderman*, 965 F.2d at 718–19; *see also Amerada Hess*, 488 U.S. at 433–34 (noting the Court "start[ed] from the settled proposition that the subject-matter jurisdiction of the lower federal courts is determined by Congress in the exact degrees and character which to Congress may seem proper for the public good" and holding that "the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts" (citations and internal quotation marks omitted)). Congress does not appear to have acted in the same way to define federal court jurisdiction over suits against the United States by foreign nationals under the ATS, except through the ATS itself. Therefore, it is imperative to consider *jus cogens* and its impact on the United States's immunity in light of the Court's painstaking interpretation of the ATS in *Sosa* and the common law torts recognized therein.

42

nations and] transcend such consent, as exemplified by the theories underlying the judgments of the Nuremberg tribunals following World War II"); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206–07 (D.C. Cir. 1985) (Scalia, Circuit J.) (describing "the law of nations [as] so-called customary international law, arising from the customs and usages of civilized nations" (citation and internal quotation marks omitted)).

Although not all *jus cogens* norms may fall within the category of international common law torts that federal courts can recognize under *Sosa*, it seems logical that cognizable *jus cogens* norms may preclude a sovereign immunity defense. *Cf.* Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 COLUM. L. REV. 830, 879–82, 890–95, 901–08 (2006) (analyzing history, *Sosa*, and legislative documents from the founding era to postulate about which international common law torts are cognizable under the ATS); Sarah H. Cleveland, *The Kiobel Presumption and Extraterritoriality*, 52 COLUM. J. TRANSNAT'L L. 8, 17–19 (2013) (similar, but arguing for a more expansive view of which torts are cognizable, especially in the extraterritorial context); *cf. also The Paquete Habana*, 175 U.S. 677, 700–01 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction . . . ."); *Estate of Amergi ex rel. Amergi v. Palestinian Auth.*, 611 F.3d 1350, 1363–64 (11th Cir. 2010) (describing the type of international tort that federal courts may recognize under the ATS and *Sosa*). Plaintiffs raise this argument—that sovereign immunity may be unavailable for a category of *jus cogens* torts or other violations of the law of nations—but neither the reinstated panel nor the en banc opinion addresses it.

*Sosa* also did not address sovereign immunity vis-à-vis the ATS. In that case, the Court only considered the claims of a foreign national named Alvarez-

No. 11-50792 Cons/w Nos. 12-50217 & 12-50301

Machain that he was kidnapped by another foreign national, Sosa, at the behest of the U.S. Drug Enforcement Administration ("DEA"). 542 U.S. at 698–99. The Court ultimately held that the alleged international norm in question was insufficient to support a claim under the common law underlying the ATS. *Id.* at 712. *Sosa*'s language, however, hints at the idea that the ATS contemplated something broader than merely giving jurisdiction for an action Congress authorizes: "[T]here is every reason to suppose that the First Congress did not pass the ATS as a jurisdictional convenience to be placed on the shelf for use by a future Congress . . . ." *Id.* at 719.

Unlike *Sosa*, here the United States was substituted for Mesa under the Westfall Act. Plaintiffs could have sought (but did not seek) federal-court review of the Attorney General's scope-of-employment certification under the Westfall Act. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995); *see also Osborn v. Haley*, 549 U.S. 225 (2007). Indeed, given Plaintiffs' argument that *jus cogens* violations are not legitimate official acts, Plaintiffs may have had a strong basis for raising such a challenge.[5] *See, e.g.*, *Yousuf*, 699 F.3d at 776 (distinguishing between status- and conduct-based immunity). Moreover, I note that the Special Concurrence does not take issue with the observation that Plaintiffs chose not to pursue this viable option for challenging Mesa's conduct.

---

[5] Thus, Plaintiffs' concern that people in Mesa's situation can commit wrongful acts with impunity is not accurate. A *Bivens* action does not stand alone as Plaintiffs' last resort to seek review of this tragedy. In addition to challenging the substitution by the United States, Plaintiffs may be able to seek redress in Mexican courts or through Mexican diplomatic channels. *See* 18 U.S.C. § 3184. State processes may also be available. *See* 28 U.S.C. § 2679(d)(3). Finally, Congress has exemplars both for establishing a compensation system for victims of United States government overseas torts, *see* 21 U.S.C. § 904, and also for waiving foreign sovereign immunity, *see* 28 U.S.C. § 1605(a).

No. 11-50792 Cons/w Nos. 12-50217 & 12-50301

I conclude that Plaintiffs' argument on sovereign immunity and the ATS has some force. But in this area of great delicacy involving international diplomacy and United States sovereign immunity, I believe it is best to leave this issue to the Supreme Court or at least to a court more appropriately positioned to address these intricate issues. *See Sosa*, 542 U.S. at 725 ("[T]here are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind."); *id.* at 728 (similar); *see also id.* at 750 (Scalia, J., concurring in part and concurring in the judgment) (decrying the notion that lower federal courts will be determining "perceived international norms"). Accordingly, I concur in the judgment of the en banc court.

No. 11-50792 Cons/w Nos. 12-50217 & 12-50301

JAMES E. GRAVES, JR., Circuit Judge, concurring in part:

I agree with the majority that the Fifth Amendment right was not clearly established at the time of the incident. But I also join, in part, the concurring opinion of Judge Prado, except to the extent that it adopts the en banc court's reasons for denying the Fourth Amendment claim. Additionally, I join, in part, Judges Dennis and Haynes in concluding that the plaintiffs' claims under the Fourth Amendment and the Alien Tort Statute (ATS) have force. However, I disagree with the conclusions of Judges Dennis and Haynes that this court should forego the adjudication of such claims.[1] Instead, I would conclude that this court should carefully adjudicate the ATS and Fourth Amendment claims. *See Sosa* 542 U.S. 712-13, 724-26; and 28 U.S.C. § 1350. For these reasons, I respectfully concur with the majority opinion in part and join the separate opinions of Judges Dennis, Prado and Haynes in part.

---

[1] I also disagree with Judge Haynes' concurrence to the extent that it lists various other forms of review or redress which are, for the most part, unavailable, ineffective, or do not provide the same relief as a *Bivens* action.

46